## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

The Lynn M. Kennis Trust U/A DTD
10/02/2002, by Lynn M. Kennis as Trustee,
and the Ronald J. Kennis Trust, by Ronald J.
Kennis and Dolores M. Kennis as Trustees,

      Plaintiffs,

v.

First Eagle Investment Management, LLC,

      Defendant.

C.A. No. 14-585-(SLR/SRF)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
## FIRST EAGLE INVESTMENT MANAGEMENT, LLC'S MOTION TO DISMISS

ZWERLING, SCHACHTER &
  ZWERLING, LLP
Robin F. Zwerling (admitted *pro hac vice*)
Jeffrey C. Zwerling (admitted *pro hac vice*)
Susan Salvetti (admitted *pro hac vice*)
Andrew W. Robertson (admitted *pro hac vice*)
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900

SCHNADER HARRISON
  SEGAL & LEWIS LLP
Richard A. Barkasy (#4683)
Fred Hoensch (#5761)
824 N. Market Street, Suite 800
Wilmington, DE 19801
Tel: (302) 888-4554

*Attorneys for Plaintiffs*

Dated:  September 11, 2014

# **TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 1

STATEMENT OF RELEVANT FACTS ....................................................................... 3

    Nature and Quality of FEIM's Investment Advisory Services to the Funds ......................... 3

    Fees Paid by Other Clients for FEIM's Investment Advisory Services ............................... 4

    Economies of Scale and Profitability Realized by FEIM .................................................. 5

    Board Approval of the Advisory Fees Charged to the Funds ............................................. 6

ARGUMENT ............................................................................................................ 7

I.    THE APPLICABLE PLEADING STANDARD ..................................................... 7

II.   BACKGROUND REGARDING SECTION 36(b) .................................................. 8

    A.   Legislative History ................................................................................ 8

    B.   Defendant Attempts to Rewrite the Legislative Intent Behind Section 36(b) ........... 10

III.  RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT
     A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE
     TO THE SERVICES PROVIDED AND ARE OUTSIDE THE ARM'S-LENGTH
     RANGE .................................................................................................. 11

IV.  THE LIMITATIONS ATTENDANT TO JUDICIAL NOTICE PRECLUDE
     DISMISSAL OF THE COMPLAINT ................................................................ 13

V.   DEFENDANT CHARGES ADVISORY FEES TO THE FUNDS OUTSIDE THE
     RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH ..................... 15

    A.   The Large Disparity Between the Fees Charged by Defendant to the First Eagle
        Funds and the Fees It Charges to the Subadvised Fund Cannot Be Explained
        by Any Difference in the Investment Advisory Services. ............................... 15

        1.   The Large Disparity in Fees Charged ............................................ 16

        2.   The Significantly Higher Fees Charged by Defendant to the First Eagle
           Funds Are Not Justified by Any Meaningful Difference in the Investment
           Advisory Services Provided. ....................................................... 19

i

3. The Subadvised Fund's Fees Were Negotiated at Arm's Length. ...................... 21

4. The Fee Comparisons to the Subadvised Fund Support a Plausible Inference that the Fees Charged to the First Eagle Funds Are Excessive. ......... 22

5. Defendant's Peer Group Comparisons Do Not Support Dismissal.................... 23

VI. DEFENDANT REALIZED ECONOMIES OF SCALE AND DID NOT APPROPRIATELY SHARE THE BENEFITS WITH THE FUNDS.................................................................. 24

The Complaint Adequately Alleges that FEIM Realized Economies of Scale and Failed to Appropriately Share the Benefits with the First Eagle Funds........................ 25

VII. APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE ................................................................................... 29

CONCLUSION.................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
    464 F.3d at 338 (2d Cir. 2006) ................................................................. 28, 32, 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 7

*Brinkmeier v. Graco Children's Prods. Inc.*,
    767 F. Supp. 2d 488 (D. Del. 2011) ........................................................... 8, 16, 18

*Curran v. Principal Mgmt. Corp.*,
    No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010).................. *passim*

*Daily Income Fund, Inc. v. Fox*,
    464 U.S. 523 (1984) ....................................................................................... 8, 9, 30

*Dumond v. Mass. Fin. Servs. Co.*,
    No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006) .................. 13, 32

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 (2d Cir. 1982) ............................................................................ *passim*

*Hamilton v. Allen*,
    396 F. Supp. 2d 545 (E.D. Pa. 2005) ................................................................... 23

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d. 522 (S.D.N.Y. 2008) ................................................................. 28

*Hunt v. Invesco Funds Group, Inc.*,
    No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006).................. 13, 22, 32

*Hynoski v. Columbia County Redevelopment Auth.*,
    941 F. Supp. 2d 547 (M.D. Pa. 2013) .................................................................. 14

*In re Am. Mut. Funds Fee Litig.*,
    No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ............................ 27

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ............................................................................... 13

*In re Federated Mut. Funds Excessive Fee Litig.*,
    No. 2:04cv352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ........................ *passim*

*In re Franklin Mut. Funds Fee Litig.*,
    478 F. Supp. 2d 677 (D.N.J. 2007) .................................................................. 10, 28

*In re Goldman Sachs Mut. Funds Fee Litig.*,
    No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ................................................ 27

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) .................................................................. 14

*In re NAHC, Inc. Sec. Litig.*,
    No. Civ.A. 00-4020, 2001 WL 1241007 (E.D. Pa. Oct. 17, 2001) ............................................ 15

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ................................................... 17

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    528 F. Supp. 2d 332 (S.D.N.Y. 2007) .................................................. 28

*In re Scudder Mut. Funds Fee Litig.*,
    No. 04 Civ. 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ............................................ 28

*Jones v. Harris Assocs. L.P.*,
    537 F.3d 728 (7th Cir. 2008) .................................................................. 24

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010) ..................................................................... *passim*

*Kalish v. Franklin Advisers, Inc.*,
    742 F. Supp. 1222 (S.D.N.Y. 1990) .................................................... 27

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) .......................................................................... 9

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
    No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012) .................................................. *passim*

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993) .................................................................. 21

*Krantz v. Prudential Inv. Fund Mgm't LLC*,
    305 F.3d 140 (3d Cir. 2002) ............................................................ 22

*Krantz v. Prudential Inv. Fund Mgm't LLC*,
    77 F. Supp. 2d 559 (D.N.J. 1999) ...................................................... 32

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989) ............................................................. 27

iv

*LaSalle Nat'l Bank v. First Conn. Holding Group, LLC*,
   287 F.3d 279 (3d Cir. 2002) ................................................................... 13

*Lorah v. Tetra Tech Inc.*,
   541 F. Supp. 2d 629 (D. Del. 2008) ........................................................ 13

*McArdle v. Verizon Commc'ns Inc.*,
   No. 13-4207, 2014 WL 2153839 (3d Cir. May 23, 2014) ........................... 7

*McMahon v. General Dynamics Corp.*,
   933 F. Supp. 2d 682 (D.N.J. 2013) ......................................................... 14

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   248 F.3d 321 (4th Cir. 2001) ........................................................ 9, 24, 32

*Millenco L.P. v. MEVC Advisors, Inc.*,
   No. CIV. 02-142, 2002 WL 31051604 (D. Del. Aug. 21, 2002) ..................... *passim*

*Mintz v. Baron*,
   No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ................... 28

*Netgear, Inc. v. Ruckus Wireless, Inc.*,
   852 F. Supp. 2d 470 (D. Del. 2012) ......................................................... 8

*Phillip A. Templeton, M.D., P.A. v. EmCare, Inc.*,
   868 F. Supp. 2d 333 (D. Del. 2012) ....................................................... 18

*R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*,
   425 Fed. Appx. 25 (2d Cir. 2011) ..................................................... *passim*

*Reed v. Schuylkill Health Sys.*,
   No. 3:CV-13-1175, 2013 WL 6479127 (M.D. Pa. Dec. 9, 2013) .................. 20

*Rehab. Inst. of North Jersey, Inc. v. Home Depot Inc.*,
   No. 12-4035, 2012 WL 5944658 (D.N.J. Nov. 27, 2012) ........................... 20

*Reso v. Artisan Partners Ltd. P'ship*,
   No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) ........... 12, 16, 22, 31

*Ricoh Co. Ltd. v. Oki Data Corp.*,
   Civ. No. 09–694–SLR, 2010 WL 3908603 (D. Del. Sept. 30, 2010) .......... 13, 14, 15

*Ruffin v. Bank of America*,
   No. 12-1677, 2014 WL 3828408 (D. Del. Aug. 1, 2014) ........................ 21, 29

*Sins v. Janus Capital Mgmt., LLC*,
   No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ............... 13, 22

*Strigliabotti v. Franklin Res., Inc.*,
   No. C 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005)................................................. 13

*Thompson v. Real Estate Mortgage Network*,
   748 F.3d 142 (3d Cir. 2014)........................................................................................... 7

*Werner v. Werner*,
   267 F.3d at 288 (3d Cir. 2001).......................................................................................... 13

*Wicks v. Putnam Inv. Mgmt., LLC*,
   No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005)................................... 13, 27

*Yampolsky v. Morgan Stanley Inv. Advisers Inc.*,
   No. 03 Civ. 5710, 2004 WL 1065533 (S.D.N.Y. May 12, 2004),.......................................... 28

**Statutes**

15 U.S.C. § 80a-35(b) ........................................................................................................... 1, 9

**Rules**

Federal Rule of Evidence 201(b) ......................................................................................... 13, 14

Federal Rules of Civil Procedure Rule 8(a)(2) ........................................................................ 7

**Other Authorities**

University of Pennsylvania's Wharton School of Finance and Commerce,
   A STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962)................................................. 9

Senate Committee on Banking & Currency,
   S. REP. NO. 91-184 (1969)................................................................................................... 9

U.S. SECURITIES AND EXCHANGE COMMISSION, DIVISION OF INVESTMENT
   MANAGEMENT, PROTECTING INVESTORS: A HALF CENTURY OF INVESTMENT
   COMPANY REGULATION (May 1992)................................................................................ 26, 29

DAVID SWENSEN, UNCONVENTIONAL SUCCESS: A FUNDAMENTAL
   APPROACH TO PERSONAL INVESTMENT (2005) ........................................................................ 25

Committee on Interstate and Foreign Commerce,
   H.R. Rep. NO. 91-1382 (1970)........................................................................................10, 11

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs, on behalf of and for the benefit of the First Eagle Global Fund (the "Global Fund") and the First Eagle Overseas Fund (the "Overseas Fund") (together, the "First Eagle Funds" or "Funds"), bring this action against Defendant First Eagle Investment Management, LLC ("Defendant" or "FEIM") pursuant to § 36(b) of the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a-35(b). Plaintiffs allege that Defendant breached its fiduciary duty by receiving investment advisory fees from each of the Funds that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining. Plaintiffs respectfully submit this memorandum of law in opposition to Defendant's motion to dismiss.

## SUMMARY OF ARGUMENT

Defendant's investment advisory fee arrangements with the First Eagle Funds epitomize the conflicts of interest and potential for abuse that led Congress to enact § 36(b) of the 1940 Act. Unconstrained by competitive pressures, Defendant charges advisory fees to the First Eagle Funds that are as much as 97% higher than the fees negotiated at arm's length by Defendant and an independent mutual fund client, the Mercer Global Low Volatility Equity Fund (the "Subadvised Fund"), for the same or substantially the same FEIM advisory services. As the First Eagle Funds have grown to and remained at substantial asset levels, Defendant has captured for itself the benefits of economies of scale in the form of higher fees and profits, without appropriately sharing those benefits with the Funds. Approval of the fees by the Funds' Board of Trustees (the "Board") has not served as an effective check on the fees charged. In arguing for dismissal, Defendant would require Plaintiffs to *prove* their claims rather than *plead* them. But Plaintiffs need only allege enough factual matter to plausibly state a claim for relief. When read as a whole, the Complaint surely does so.

1.      The facts and circumstances pertaining to the advisory fees charged to the Funds fall squarely within the standard of liability for evaluating § 36(b) claims established by the U.S. Supreme Court in *Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010).   The large disparity between fees charged to the First Eagle Funds and to the Subadvised Fund supports a plausible inference that the fees charged to the Funds are disproportionate to the services provided and outside the range of what could be negotiated at arm's length.   Numerous courts have denied motions to dismiss § 36(b) claims based on comparable allegations.

2.      Defendant seeks to escape liability for charging excessive fees simply because the fees that it receives on the open market for providing the same or substantially the same services are not publicly disclosed.   However, using a range of fees that the adviser-sponsor of the Subadvised Fund has negotiated in the open market with other subadvisors, Plaintiffs have plausibly alleged the arm's-length range of fees for Defendant's investment advisory services. A comparison with this range of fees—which the Supreme Court has held to be the benchmark comparison for § 36(b) claims—reveals a fee disparity of as much as $238 million per year. This is precisely the type of fee disparity that § 36(b) was designed to redress.

3.      With respect to the Global Fund, Defendant does not argue that the services it provides differ in any meaningful way from the services it provides to the Subadvised Fund. Defendant's attempt to distinguish the Overseas Fund from the Subadvised Fund based on certain immaterial differences does not alter that the core investment management services provided to those funds are the same or substantially the same.

4.      The substantial increase in fees charged to the Funds, without a corresponding change in the services provided by Defendant or the cost to Defendant of providing those services, further evidences that the fees are excessive.

2

5.     Finally, the Board's failure to act at arm's length from FEIM or to consider information necessary to properly evaluate FEIM's advisory fees requires that little deference be given to the Board's approval.

## STATEMENT OF RELEVANT FACTS

**Nature and Quality of FEIM's Investment Advisory Services to the Funds**

Defendant FEIM serves as investment adviser to the Funds pursuant to an Investment Advisory Contract ("IAC").  ¶ 27.[1]  Pursuant to the IAC, FEIM is to provide certain investment advisory services to each First Eagle Fund, including: (a) "regularly provid[ing] [each Fund] with investment research, advice and supervision"; (b) "furnish[ing] continuously an investment program for [each Fund's] Portfolio"; and (c) "recommend[ing] what securities shall be purchased for each of the Funds, what portfolio securities shall be sold by each Fund, and what portion of each Fund's assets shall be held uninvested." ¶ 28.

Both First Eagle Funds invest primarily in equity securities, with substantial investments in the equity securities of foreign, non-U.S. companies. ¶ 30.  Both Funds also "may invest in fixed income instruments . . . , short-term debt instruments, gold and other precious metals, and futures contracts related to precious metals."  ¶ 31.  Both Funds select investments "without regard to the capitalization (size) of the [issuer]" and "may invest in any size company, including large, medium and smaller companies."  ¶ 32.  Defendant employs the same "'value' approach" in selecting investments for both Funds.  ¶ 33.  The same team of FEIM portfolio managers, analysts, research associates, and traders provides investment advisory services to both First Eagle Funds.  ¶ 34.

---

[1]     All ¶ references are to the Complaint (D.I. 1).

In exchange for the investment advisory services provided by FEIM to the First Eagle Funds, the IAC requires each Fund to pay FEIM an annual fee that is calculated as a percentage of the Fund's assets under management or "AUM." ¶ 39.  The investment advisory fee rate for each Fund is 75 basis points or 0.75% of the Fund's AUM. ¶ 40.  In 2013, the Global Fund paid Defendant more than $306,000,000 in investment advisory fees, and the Overseas Fund paid Defendant approximately $97,000,000 in investment advisory fees. ¶¶ 41-42.

**Fees Paid by Other Clients for FEIM's Investment Advisory Services**

FEIM also provides investment advisory services to other mutual fund clients. ¶¶ 43-44. One such "Subadvised Fund" is organized and sponsored by Mercer Investment Management, Inc. ("Mercer"), which nominally serves as the investment adviser of the Subadvised Fund. ¶¶ 45, 49.  Unlike the First Eagle Funds, the Subadvised Fund is an "independent," rather than "captive" mutual fund of Defendant.  Mercer has subcontracted with FEIM to provide investment advisory services to its fund. ¶ 50.  Pursuant to the subadvisory agreement between FEIM and Mercer, FEIM acts as a subadviser and provides investment advisory services to the Subadvised Fund in exchange for a fee which is paid by Mercer. ¶¶ 50-51.[2]

The investment advisory services that FEIM provides as subadviser to the Subadvised Fund are the same or substantially the same as the services Defendant provides to the Funds pursuant to the IAC. ¶ 52.  For example, like the Funds' IAC, the Mercer subadvisory agreement requires FEIM to:  "conduct an ongoing program of investment, evaluation and, if appropriate, sale and reinvestment" of the Subadvised Fund's assets, including "purchas[ing], hold[ing] and sell[ing] investments" and "monitor[ing] such investments on an ongoing basis." ¶ 53.

---

[2]   Defendant's contention that it only manages "a portion" of the Subadvised Fund (Def. Br. at 2, 6) has no bearing on the claims at issue.   FEIM is compensated based on the "portion" that it manages.

For both the First Eagle Funds and the Subadvised Fund, FEIM employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities. ¶¶ 52-58. The same portfolio managers and other investment professionals who manage each of the Funds also manage the Subadvised Fund. ¶ 59. FEIM uses the same or substantially the same research and analysis, as well as systems, technology, and other resources in providing investment advisory services to the Subadvised Fund as it uses in providing investment advisory services to the First Eagle Funds. ¶ 60. The same or substantially the same legal, compliance, and administrative personnel are responsible for ensuring that FEIM's investment advisory services for both the First Eagle Funds and the Subadvised Fund comply with applicable laws. ¶¶ 61-62.

Despite the virtually complete overlap in services, upon information and belief, the fees that FEIM receives for providing investment advisory services to the Subadvised Fund are significantly lower than the fees paid by the Funds for those same services, resulting in the Funds collectively paying more than $238 million in excessive fees in fiscal year 2013 alone. ¶¶ 63-69.

The higher fees paid by the Funds are not justified by any additional services provided to the Funds by Defendant or its affiliates. ¶ 70. Defendant does not contest that, to the extent Defendant or its affiliates provide other services to the Funds, beyond the investment advisory services, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid under the IAC. ¶¶ 71-73. Nor does Defendant contest the Complaint's allegations that compensation to the Funds' officers and/or rent for office space is *de minimis* relative to the additional investment advisory fees paid by the Funds. ¶¶ 74-79.

**Economies of Scale and Profitability Realized by FEIM**

While the assets of each Fund have increased dramatically over the past several years, Defendant has benefitted from economies of scale that were not adequately shared with the

Funds. From 2009-2013, the Global Fund's AUM increased from approximately $19 billion to $46 billion, resulting in an increase in the investment advisory fees of more than 142% from $126 million to more than $306 million. ¶¶ 80-81. During the same approximate time period, the AUM of the Overseas Fund increased from approximately $7 billion to more than $14 billion, resulting in an increase in the investment advisory fees of more than 111% from $46 million to more than $97 million. ¶¶ 82-83.

The increases in advisory fees paid by each First Eagle Fund were not accompanied by a proportionate increase in the work or cost by FEIM to provide investment advisory services to the Funds. ¶ 84. As a result, FEIM realized economies of scale, which reduced the cost as a percentage of the Funds' AUM of providing investment advisory services to each Fund. ¶ 85.

Because investment advisers realize economies of scale as AUM increase, mutual fund investment advisory fee schedules often include breakpoints, which reduce a fund's fee rate as AUM increase. ¶ 86. Absent breakpoints, or if the breakpoints do not appropriately reduce the effective fee rate paid by a fund, the benefits of economies of scale accrue to a fund's investment adviser in the form of higher fees and profits. ¶ 88.

Here, the Funds' investment advisory fee schedules do not include any breakpoints whatsoever, and require each Fund to pay a rate of 75 basis points on all AUM. ¶ 89. Without any breakpoints, the benefits of economies of scale accrue to Defendant, at the expense of the Funds, because the investment advisory fee rate paid by each Fund remains the same regardless of the amount of the Fund's AUM, resulting in higher fees and profits for Defendant. ¶¶ 100-101.

**Board Approval of the Advisory Fees Charged to the Funds**

The Funds' Board has approved the IAC each year without devoting the time and attention necessary to assess the advisory fees charged to the Funds. ¶ 93. The Board passively

accepted FEIM's rationalization for the fees charged and did not appropriately examine, among other things, the disparity in fees charged to the First Eagle Funds and the Subadvised Fund or any purported justification for such disparity.  ¶¶ 96-103.

## ARGUMENT

## I.     THE APPLICABLE PLEADING STANDARD

Federal Rules of Civil Procedure Rule 8 governs the pleading sufficiency of a § 36(b) claim.  *See In re Federated Mut. Funds Excessive Fee Litig*., No. 2:04cv352, 2009 WL 5821045, at *3 (W.D. Pa. Sept. 30, 2009).  Rule  8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a)(2); *see also Thompson v. Real Estate Mortgage Network*, 748 F.3d 142, 147 (3d Cir. 2014) (reiterating that "notice pleading" remains the standard and that a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element" (quotation marks and citations omitted)).  This standard "do[es] not require heightened fact pleading of specifics…."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also In re Federated*, 2009 WL 5821045, at *3.

To survive a motion to dismiss, a complaint must simply contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  While this plausibility standard requires a plaintiff to show that success on the merits is more than a "sheer possibility," it is not a "probability requirement."  *Id*.

When reviewing a motion to dismiss on the pleadings, a district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *McArdle v. Verizon Commc'ns Inc.*, No. 13-4207, 2014 WL 2153839, at *2 (3d Cir.

May 23, 2014) (quotations marks and citation omitted).  Allegations made upon information and belief must be accepted as true and considered in construing the complaint.  *See Netgear, Inc. v. Ruckus Wireless, Inc.*, 852 F. Supp. 2d 470, 474 n.5 (D. Del. 2012); *Brinkmeier v. Graco Children's Prods. Inc.*, 767 F. Supp. 2d 488, 496 (D. Del. 2011).  As Defendant's authority recognizes, "[t]he purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."  *Millenco L.P. v. MEVC Advisors, Inc*., No. CIV. 02-142, 2002 WL 31051604, at *2 (D. Del. Aug. 21, 2002).

## II.      BACKGROUND REGARDING SECTION 36(b)

### A.      Legislative History

Congress adopted the 1940 Act to regulate investment companies, including mutual funds.  Typically, a mutual fund is created by an investment adviser, which is an entity separate from the fund.  *See Jones*, 559 U.S. at 338.   "The adviser selects the fund's directors, manages the fund's investments, and provides other services."  *Id*.  In this sense, a mutual fund is often referred to as "captive" of its adviser.  *Id*. at 349.  Recognizing that the relationship between an investment adviser and its captive mutual fund is "fraught with potential conflicts of interest," and concerned about the "potential for abuse" in this structure, Congress enacted protections for mutual fund shareholders in the 1940 Act.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536-38 (1984) (quotation marks and citations omitted).

Congress amended the 1940 Act in 1970 to provide additional protections to shareholders with respect to the fees charged by investment advisers to their captive mutual funds.  Among other amendments, Congress added a new § 36(b), which provides:

> [T]he investment adviser of a [mutual fund] shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [the mutual fund], or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b). Section 36(b) creates a private right of action for fund shareholders to enforce the fiduciary duty created by the statute on behalf of the fund. *See id.*

Section 36(b) reflects Congress's determination that "the forces of arms-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." S. REP. NO. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901. This conclusion was based in part on a study of the mutual fund industry by the University of Pennsylvania's Wharton School of Finance and Commerce. *See* A STUDY OF MUTUAL FUNDS, H.R. REP. NO. 87-2274 (1962) ("Wharton Report").[3] The Wharton Report determined that "investment advisers often charged mutual funds higher fees than those charged the advisers' other clients," *Daily Income Fund*, 464 U.S. at 537 (citing Wharton Report at 28-30), and the "principal reason for the differences in rates" was that "competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds." Wharton Report at 493-94.

Section 36(b) also reflects Congress's intent to ensure that investors "share equitably . . . in the economies available as a result of the growth and general acceptance of mutual funds." S. REP. NO. 91-184, at 4 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901. Congress recognized that investment advisers realize economies of scale because "as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326-27 (4th Cir. 2001).

Finally, § 36(b) reflects Congress's conclusion that "shareholders should not have to rely solely on the fund's directors to assure reasonable adviser fees." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (quotation marks and citation omitted). Congress established §

---

[3]       Also available at: http://www.sechistorical.org/museum/galleries/tbi/gogo_c.php.

36(b) as a "mechanism by which the fairness of" those fees "could be tested in court."  S. REP. NO. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.

### B.    Defendant Attempts to Rewrite the Legislative Intent Behind Section 36(b)

Defendant incorrectly asserts that "a stated intent of the drafters of the 1970 amendments . . . was 'to prevent the harassment of investment advisors by ill-founded or nuisance law suits.'" Def. Br. at 18 (citing *In re Franklin Mut. Fund Fees Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007)).  The House Report that Defendant cites as evidence of this supposed intent described proposed amendments that were ultimately ***rejected*** and ***not included*** in § 36(b).  The House proposed language in § 36(b) that would have required a plaintiff to prove a breach of fiduciary duty by "clear and convincing evidence."  H.R. REP. No. 91-1382, at 4118 (1970).[4]  It was this "increased burden" that the House was discussing in the quote cited by Defendant.  *Id.*

However, this heightened standard of proof was ultimately rejected.  The SEC and Senate opposed the use of a "clear and convincing" burden of proof, likening it to a "quasi-criminal" standard.  *See id.* at 4198 ("Both the [SEC] and the Investment Company Institute intended, as did the Senate, that an action under Section 36(b) should not be quasi-criminal. Consequently, this element should not be introduced into Section 36(b).").

Rather, the amendment of the 1940 Act to include § 36(b) was specifically intended to provide additional protections **to shareholders** in mutual funds.  This is confirmed on the first page of H.R. REP. No. 91-1382, cited by Defendant (and the court in *In re Franklin*) (Def. Br. at 18):

> The purpose of the legislation [*i.e.*, the 1970 Amendments] is to make comprehensive amendments to the Investment Company Act of 1940 (the Act) for

---

[4]    Also available at www.sechistorical.org/collection/papers/1940/1940_SICA_I.pdf.

the first time in three decades. . . . In addition to updating the Act in many respects and making numerous technical improvements in the Act, the bill would add a number of new provisions to the Act **to provide additional safeguards and protections to public investors**.

H.R. REP. 91-1382, at 4111 (emphasis added).

Forty years later, the Supreme Court in *Jones* reaffirmed that the 1970 amendments were designed to "bolster[] shareholder protection" because the SEC had "identified problems relating to the independence of investment company boards and the compensation received by investment advisers." *Jones,* 559 U.S. at 339. Thus, consistent with the actual intent behind the 1970 amendments and the Supreme Court's acknowledgement in *Jones*, Plaintiffs' claims must be assessed with an eye towards shareholder protection, not shielding investment advisers from liability for charging excessive fees.

## III. RULE 8(a) IS SATISFIED WHERE THE FACTS ALLEGED SUPPORT A PLAUSIBLE INFERENCE THAT THE FEES ARE DISPROPORTIONATE TO THE SERVICES PROVIDED AND ARE OUTSIDE THE ARM'S-LENGTH RANGE

"[T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 559 U.S. at 346. This standard of § 36(b) liability was formulated by the Second Circuit in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), and adopted by the Supreme Court. *Jones*, 559 U.S. at 346. In applying the "*Gartenberg* standard," courts must consider "all relevant circumstances" and "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347.

Relevant circumstances considered by courts applying the *Gartenberg* standard include, but are not limited to: (1) the nature and quality of services provided to the fund; (2) fees paid by others, including the adviser's other clients, for comparable services; (3) the profitability of the

fund to the adviser; (4) the economies of scale realized by the adviser in providing services to the fund and the extent to which the benefits of those economies of scale have been shared with the fund; (5) any "fall-out benefits" or collateral financial benefits to the adviser from its relationship with the fund; and (6) the independence, expertise, care, and conscientiousness of the fund's board of directors in approving the challenged fees.  *See id.* at 344-45.

Plaintiffs "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee." *Curran v. Principal Mgmt. Corp.*, No. 4:09-cv-00433, 2010 WL 2889752, at \*9 (S.D. Iowa June 8, 2010).

Contrary to any implication that the *Gartenberg* factors are pleading requirements, those factors, while pertinent, are "non-exclusive." *See In re Federated*, 2009 WL 5821045, at \*3. That is, Plaintiffs are *not* required to plead facts with respect to all of the *Gartenberg* factors. *See Kasilag v. Hartford Inv. Fin. Servs., LLC,* No. 11-1083, 2012 WL 6568409, at \*2 (D.N.J. Dec. 17, 2012); *Curran,* 2010 WL 2889752, at \*9; *Reso v. Artisan Partners Ltd. P'ship,* No. 11-CV-873, 2011 WL 5826034, at \*5 (E.D. Wis. Nov. 18, 2011).  Defendant's authority recognizes as much.  *See Millenco*, 2002 WL 31051604, at \*3 n.3 ("The Court will not engage in an analysis of the [*Gartenberg*] factors. . . . This is because the Court agrees with [plaintiff] that the *Gartenberg* decision does not set a pleading standard, but rather is helpful only after the complete evidentiary record has been established.").[5]

Courts in this Circuit and throughout the country have often denied motions to dismiss § 36(b) claims founded upon allegations similar to those here, as further discussed herein.  *See, e.g.*, *R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 Fed.

---

[5]      In any event, Plaintiffs' allegations address *Gartenberg*.

Appx. 25 (2d Cir. 2011); *Kasilag,* 2012 WL 6568409; *In re Federated*, 2009 WL 5821045; *Reso*, 2011 WL 5826034; *Curran,* 2010 WL 2889752; *Sins v. Janus Capital Mgmt*., *LLC*, No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Group, Inc*., No. H-04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.*, No. Civ. A. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *Wicks v. Putnam Inv. Mgmt., LLC*, No. Civ.A.04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005); *Strigliabotti v. Franklin Res., Inc*., No. C 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005); *Millenco*, 2002 WL 31051604.

## IV.   THE LIMITATIONS ATTENDANT TO JUDICIAL NOTICE PRECLUDE DISMISSAL OF THE COMPLAINT

In ruling on a motion to dismiss, a district court may not consider matters extraneous to the pleading. *See Lorah v. Tetra Tech Inc., 541* F. Supp. 2d 629, 631 n.1 (D. Del. 2008) (citing *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997)).   Yet, in its motion, Defendant proffers materials prepared and/or published by Morningstar and Lipper—including ratings analyses, printouts from Morningstar's website and fund classification descriptions—that are neither relied upon, nor even referenced in the Complaint.   *See* Declaration of Matthew J. Thome (D.I. 17) ("Thome Decl.") Exs. B-J, M-O.   Defendant's request that judicial notice be taken of these documents (Def. Br. at 5) should be rejected.

As this Court explained in *Ricoh Co. Ltd. v. Oki Data Corp*.:

Federal Rule of Evidence ("F.R.E.") 201(b) states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."…"For all practical purposes, judicially noticing a fact is tantamount to directing a verdict against a party as to the noticed fact." *LaSalle Nat'l Bank v. First Conn. Holding Group, LLC,* 287 F.3d 279, 290 (3d Cir. 2002) (citing *Werner v. Werner*, 267 F.3d at 288 (3d Cir. 2001)).

Civ. No. 09–694–SLR, 2010 WL 3908603, at *3 (D. Del. Sept. 30, 2010).

The Morningstar and Lipper documents do not meet the requirements of F.R.E. 201(b) because they are subject to reasonable dispute in that they are **not** capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  In fact, certain of the Morningstar reports explicitly state:

> **"The information contained herein…is not warranted to be accurate, complete or timely."**

*See* Thome Decl. Exs. B, C (emphasis added).

Under these circumstances, judicial notice of the Morningstar and Lipper materials is clearly improper.  *See Ricoh*, 2010 WL 3908603, at *4; *McMahon v. General Dynamics Corp.*, 933 F. Supp. 2d 682, 686 (D.N.J. 2013) (holding that in the context of a motion to dismiss it would be improper to rely on certain public reports to resolve factual disputes); *Hynoski v. Columbia County Redevelopment Auth.*, 941 F. Supp. 2d 547, 557 (M.D. Pa. 2013) (declining to take judicial notice of statements contained in public articles that were not undisputed).

The lone case relied upon by Defendant, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002), does not support taking judicial notice of the Morningstar or Lipper publications and analyses. In *NAHC*, the district court took judicial notice of three limited categories of documents:  (1) documents that were relied upon in the complaint; (2) documents filed with the SEC, but not relied upon in the complaint; and (3) stock price data.  *Id.* at 1331.   The Third Circuit agreed that these categories of documents—which do not include the type of Morningstar and Lipper documents proffered by Defendant here—were appropriately considered by the district court, *id.*, which considered them "for their contents rather than for the truth of the

contained statements." *In re NAHC, Inc. Sec. Litig.*, No. Civ.A. 00-4020, 2001 WL 1241007, at *5 (E.D. Pa. Oct. 17, 2001).[6]

Therefore, regardless of which documents the court takes judicial notice, "it would be improper to take notice of the truth of the contents of these documents." *Ricoh*, 2010 WL 3908603, at *4.

## V.   DEFENDANT CHARGES ADVISORY FEES TO THE FUNDS OUTSIDE THE RANGE OF WHAT COULD BE NEGOTIATED AT ARM'S LENGTH

The Supreme Court in *Jones* held that courts considering claims under § 36(b) must "use[] the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees." *Jones*, 559 U.S. at 347.  The Supreme Court further explained that the fees paid by the adviser-defendant's other clients should be given "the weight that they merit in light of the **similarities and differences between the services** that the clients in question require . . . ." *Id.* at 350 (emphasis added).  The fees paid by other clients are probative of a breach of fiduciary duty under § 36(b) "where plaintiffs have shown a large disparity in fees that cannot be explained by the different services" provided to other clients. *Id.* at 350 n.8.

### A.   The Large Disparity Between the Fees Charged by Defendant to the First Eagle Funds and the Fees It Charges to the Subadvised Fund Cannot Be Explained by Any Difference in the Investment Advisory Services.

Consistent with *Jones*, Plaintiffs have alleged that: (1) there is a large disparity between the investment advisory fees charged to the First Eagle Funds by FEIM and the fees charged to the Subadvised Fund for FEIM's investment advisory services; (2) the disparity cannot be explained by any purported differences in the services provided because FEIM provides the same or substantially the same investment advisory services to the First Eagle Funds and to the

---

[6]    In addition, Defendant's citation to cases taking judicial notice of public records relied upon by plaintiffs in their pleading, or cases where plaintiffs did not challenge the request for judicial notice (Def. Br. at 4 n.2), begs the issue regarding the limited use of judicially noticed documents.

Subadvised Fund; and (3) the fees charged by FEIM to the Subadvised Fund were the result of arm's-length negotiations.

### 1.   <u>The Large Disparity in Fees Charged.</u>

Defendant charges the First Eagle Funds 75 basis points, or 0.75% of each Fund's AUM, to provide investment advisory services.  ¶ 40.  To provide the same or substantially the same investment advisory services for the Subadvised Fund, Defendant charges Mercer between 38 and 50 basis points, or 0.38% to 0.50% of the portion of the Subadvised Fund's AUM managed by Defendant.  ¶ 66.  As a result of their higher fee rates, the Funds collectively pay as much as $238 million more in fees per year for FEIM's investment advisory services than they would pay pursuant to the fee rate charged to the Subadvised Fund.  *See* ¶¶ 68-69.

While Defendant makes much out of the fact that Plaintiffs plead the fee rate paid by Mercer for FEIM's services on "information and belief" (Def. Br. at 2, 7), courts have upheld § 36(b) claims based upon similarly pled allegations.  *See, e.g.*, *Reso*, 2011 WL 5826034, at *8 (rejecting defendant's argument that allegations made upon information and belief should be disregarded and finding that plaintiff "has alleged substantial differences in fees that are not supported by differences in services provided by [defendant]"); *Curran*, 2010 WL 2889752, at *8-9 (crediting allegations made upon information and belief and finding complaint adequately stated a claim under § 36(b)).

Further, Plaintiffs have pled a proper factual basis for their allegation that Defendant charges Mercer between 38 and 50 basis points for FEIM's services.  *See Brinkmeier*, 767 F. Supp. 2d at 496.  That allegation is founded upon an analysis of publicly available information regarding Mercer's fee arrangements with and on behalf of its other captive mutual funds.  Based on Mercer's open-market fee arrangements with twelve different subadvisers for five separate

equity mutual funds organized and sponsored by Mercer, Plaintiffs have determined that Mercer

pays subadvisory fee rates that are, on average, between 25 and 37 basis points lower than the

investment advisory fee rates that Mercer charges its captive funds.  ¶ 64.

In this case, Mercer's investment advisory fee rate charged to the Subadvised Fund (a

captive fund of Mercer) is 75 basis points (or 0.75% of AUM).  Based on Mercer's practice of

paying subadvisory fees that are between 25 and 37 basis points lower than the advisory fees

charged to its captive equity mutual funds, Plaintiffs have alleged that Mercer pays FEIM a

subadvisory fee rate of between 38 basis points and 50 basis points (75 bps – 25 bps = 50 bps; 75

bps - 37 bps = 38 bps) for providing investment advisory services to the Subadvised Fund.  ¶¶

65-66.  Using this range of fees as the comparison point, the fee rates charged by FEIM to the

First Eagle Funds are as much as 97% higher than the fee rates charged by FEIM to the

Subadvised Fund.  *See* ¶ 67.

Defendant completely distorts the purpose of the chart included in ¶ 64 of the Complaint

(which Defendant denigrates as being "fanciful"), contending that allegations that other

investment advisers breached their fiduciary duty to their own investors are not probative of the

claim here.  Def. Br. at 11-12.  However, that is not what the chart depicts, and Plaintiffs are not

arguing guilt by association.[7]  Rather, the chart sets forth the fees that Mercer has negotiated with

subadvisers to other Mercer equity mutual funds, demonstrating that Mercer pays subadvisory

fees that are, on average, 25 to 37 basis points lower than the advisory fees Mercer charges to its

captive mutual funds.  Based on those arm's-length-negotiated fee arrangements, Plaintiffs have

---

[7]     Defendant's citation to *In re Pharm. Indus. Average Wholesale Price Litig*., 307 F. Supp. 2d 196 (D. Mass. 2004), a class action asserting claims under RICO and antitrust laws, has no relevance.  In that case, there were no allegations as to the conduct of the defendant, and thus, the allegations were deemed merely as "guilt-by-association."  *Id*. at 209.  That is a far cry from the allegations here, which are particular to FEIM.

plausibly alleged that Mercer similarly pays FEIM a subadvisory fee that is 25 to 37 basis points lower than the investment advisory fee Mercer charges to the Subadvised Fund.  Defendant's own authority recognizes that the determination of whether allegations "plausibly give rise to an entitlement to relief…is a context-specific task requiring the Court to draw on its judicial experience and common sense") (quotation marks and citations omitted).  *Phillip A. Templeton, M.D., P.A. v. EmCare, Inc.*, 868 F. Supp. 2d 333, 338 (D. Del. 2012).

Pleading on information and belief is particularly appropriate here because, as Defendant acknowledges (Def. Br. at 7), the actual fee rate paid by Mercer for FEIM's services is within Defendant's control and not publicly disclosed.  *See Brinkmeier*, 767 F. Supp. 2d at 496.  As a fiduciary to the Funds, Defendant cannot be insulated from liability based on this nondisclosure because Supreme Court precedent mandates that Defendant's advisory fees be assessed in relation to the "fees that might result from arm's-length bargaining," *Jones*, 559 U.S. at 347, which in this case are the fees charged by FEIM to Mercer.  Indeed, *Jones* does not require any particular methodology to establish the arm's-length range of fees.  559 U.S. at 347.  To the contrary, what is required is that all relevant circumstances be taken into account.  *Id.*; *see also Curran*, 2010 WL 2889752, at *9 (Plaintiffs "may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee.").

Defendant argues that Plaintiffs' reliance on analysis of fee arrangements for Mercer's other equity mutual funds "reveals that Plaintiffs have no idea" what FEIM charges the Subadvised Fund.  Def. Br. at 11-12.  Yet, of the 117 pages of exhibits attached to its motion, Defendant does not include the one page from its subadvisory agreement with Mercer that could

18

demonstrate conclusively whether the fees it receives from Mercer are within or outside of the 38 to 50 basis point range alleged by Plaintiffs.

**2.   The Significantly Higher Fees Charged by Defendant to the First Eagle Funds Are Not Justified by Any Meaningful Difference in the Investment Advisory Services Provided.**

Defendant does not challenge the Complaint's allegations that FEIM provides the same or substantially the same investment advisory services to the Global Fund and the Subadvised Fund.  Defendant only argues that the Overseas Fund "is not comparable" to the Subadvised Fund.  Def. Br. at 13.  However, the Complaint's factual allegations, which must be accepted as true on this motion, support the plausible inference that, just like the Global Fund, the services provided by FEIM to both the Overseas Fund and the Subadvised Fund are the same or substantially the same.

For both the Overseas Fund and the Subadvised Fund, FEIM:

- Uses the same portfolio managers to manage the funds.  ¶ 59.
- Employs the same or substantially the same investment strategies and invests in the same or substantially the same types of securities. ¶ 54.
- Employs the same or substantially the same "value approach" in selecting investments for the funds.  ¶ 58.
- Invests primarily in equity securities with substantial investments in the equity securities of foreign, non-U.S. companies. ¶ 55.
- May invest the funds' assets "in fixed-income instruments, short-term debt instruments, securities representing gold and other precious metals, and futures contracts related to precious metals."  ¶ 56.
- Selects investments for the funds "without regard to the capitalization (size) of the [issuer]" and "may invest . . . in any size company, including large, medium and smaller companies." ¶ 57.
- Uses the same or substantially the same research and analysis, and systems, technology, and other resources in providing investment advisory services.  ¶ 60.
- Uses the same or substantially the same legal, compliance, and administrative personnel to ensure that FEIM's investment advisory services comply with applicable law.  ¶ 62.

19

- Uses the same or substantially the same systems, technology, and other resources in performing compliance responsibilities. *Id.*

Defendant's argument regarding differences in the "investment mandates" of the Overseas Fund and the Subadvised Fund boils down to nothing more than a generalized industry distinction between world allocation funds and foreign large blend funds. Def. Br. at 13-14. That one fund may invest in a higher percentage of foreign equities totally misses the point. What matters here are the factual allegations showing that the services rendered by Defendant to both First Eagle Funds are the same or substantially the same as those rendered to the Subadvised Fund, ¶¶ 43-62, including, significantly, that the same team of portfolio managers is using the same or substantially the same investment strategies, personnel, technology, and other resources in selecting investments for both funds. So too, Defendant's argument regarding performance benchmark indices is not only outside the pleadings, but also does not obscure the pertinent allegations of this case addressing the large disparity in the fees charged to the Funds for the same or substantially the same services as required by *Jones*.[8]

Defendant also seeks to distinguish the Overseas Fund from the Global Fund on the basis of "operating expenses, investment turnover rates, and rates of return," (Def. Br. at 15), but it does not proffer how any such differences in those metrics correspond to any differences in the investment strategies, much less how any such differences would justify the substantial additional fees charged to the Overseas Fund relative to the Subadvised Fund.

---

[8]     Exhibits B-F of the Thome Declaration discuss metrics which, even if considered by the court, are irrelevant as Plaintiffs are not challenging the Funds' performance. S*ee Reed v. Schuylkill Health Sys.*, No. 3:CV-13-1175, 2013 WL 6479127, at *4 (M.D. Pa. Dec. 9, 2013) ("Because these 'facts' are not alleged in the Complaint, they will not be considered in resolving Defendants' motion to dismiss."); *Rehab. Inst. of New Jersey, Inc. v. Home Depot Inc.*, No. 12–4035, 2012 WL 5944658, at *2 (D.N.J. Nov. 27, 2012) ("An argument that relies on proof of facts outside the Complaint cannot succeed on a motion to dismiss.").

As FEIM provides the same or substantially the same investment advisory services to the First Eagle Funds and to the Subadvised Fund, there is no justification for charging significantly higher fees to its captive funds. *See* ¶¶ 43-63. At best, the arguments raised by Defendant regarding purported differences between the funds, and whether such differences justify different fees, are "merits argument[s] . . . more appropriate at summary judgment." *Kasilag*, 2012 WL 6568409, at *3 (citing *Curran*, 2010 WL 2889752, at *8); *see also Ruffin v. Bank of America,* No. 12-1677, 2014 WL 3828408, at *2 ("Rule 12(b)(6) tests the sufficiency of the complaint, and does not resolve disputed facts or decide the merits of the case.") (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993); *Millenco*, 2002 WL 31051604, at *4 (denying motion to dismiss where "Complaint sufficiently alleges that the nature and quality of services provided by [defendant] to the Fund is disproportional to the fee charged" and noting that "the task of the Court at this juncture is not to evaluate or weigh the allegations").

### 3.   The Subadvised Fund's Fees Were Negotiated at Arm's Length.

Defendant does not contest that the fees charged by FEIM to the Subadvised Fund were the result of arm's-length negotiations. The adviser-sponsor of the Subadvised Fund selects investment advisers, such as FEIM, through a competitive selection process (¶ 107), and it negotiates at arm's length with FEIM and other investment advisers regarding the fees charged to provide investment advisory services to the Subadvised Fund (¶ 105), including exchanging proposals and counterproposals and seeking reductions in the fee rates charged (¶ 108).

The results of those arm's-length negotiations is that FEIM charges fees to the Subadvised Fund that are significantly lower than those it charges to the Funds. Inasmuch as the Subadvised Fund's fees are negotiated at arm's length and are not lower due to any meaningful difference in the advisory services provided by FEIM, the subadvised fees provide the range of

fees that could be negotiated at arm's length for FEIM's investment advisory services.  *See Jones*, 559 U.S. at 349.

> ### 4.  The Fee Comparisons to the Subadvised Fund Support a Plausible Inference that the Fees Charged to the First Eagle Funds Are Excessive.

That the Funds, captive to FEIM, pay as much as 97% higher fees for advisory services than the independent Subadvised Fund pays for the same or substantially the same services supports the inference that the Funds' fees are disproportionately large and outside the range of what could be negotiated at arm's length for FEIM's advisory services.  *See Jones*, 559 U.S. at 350 & n.8.

Numerous courts—both before and after *Jones*—have denied motions to dismiss § 36(b) claims where plaintiffs asserted that the adviser-defendant charged lower fees to other clients for the same or substantially the same investment advisory services.  *See, e.g.*, *Reso*, 2011 WL 5826034, at *8 (comparing fees charged by defendant to other funds that it managed for providing "similar services" and holding that the higher fees charged to the captive funds "give rise to the inference that [defendant] has comparatively over-charged the funds in this case"); *In re Federated*, 2009 WL 5821045, at *6-7 (denying motion to dismiss where complaint alleged, *inter alia*, that defendants provide the same advisory services to other clients, who are able to negotiate at arm's-length, for substantially lower fees); *Hunt*, 2006 WL 1581846, at *3 (holding that "[t]his Court agrees with other district courts that have found such allegations, that investment managers charge fund shareholders higher fees than other clients for equivalent advisory services, to be indicative of a disproportionate relationship between fees and service"); *Sins*, 2006 WL 3746130, at *3 (finding that "Plaintiffs have alleged that Defendant provides identical services to third parties at a lower cost, which would indicate a disparity"); *Cf. Krantz v. Prudential Inv. Fund Mgm't LLC*, 305 F.3d 140, 143 (3d Cir. 2002) (dismissing § 36(b) claim

where plaintiff failed to allege that the fees were excessive in relation to the services provided); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 557-58 (E.D. Pa. 2005) (same).

Courts have also denied motions to dismiss in analogous cases where an investment adviser charged its captive funds an advisory fee rate substantially higher than the fee rate paid to an independent subadviser to perform the same or substantially the same services. *See, e.g.*, *Kasilag*, 2012 WL 6568409, at \*3 (where plaintiffs alleged that defendant charged the funds an average of three times what it cost to provide "essentially the same investment management services" a plausible inference that the fees are excessive under § 36(b) was raised); *Curran*, 2010 WL 2889752, at \*9 (finding allegations that adviser-sponsor "charges more than the subadvisors, who allegedly provide the bulk of investment advice" support the reasonable inference that adviser collected excessive advisory fees).

In another analogous situation, the Second Circuit had "little trouble concluding" that plaintiffs had adequately alleged a claim under § 36(b) where defendant charged its captive funds a transfer agency fee that was significantly higher than the rate it negotiated at arm's length with an unaffiliated entity to provide transfer agency services. *R.W. Grand Lodge*, 425 Fed. Appx. at 30. The court held that "the transfer agent arrangement . . . constitutes a garden variety breach of fiduciary duty" and stated a claim under § 36(b) because "Defendants knowingly inflated the price of the transfer agent services provided to Plaintiffs and pocketed the difference between what they charged and what the services were worth." *Id.* at 30-31. Plaintiffs here make essentially the same allegation, but for a different type of fee.

### 5.   Defendant's Peer Group Comparisons Do Not Support Dismissal.

The Supreme Court in *Jones* emphasized that, in order to be probative under § 36(b), the fees used as comparison points must have been the result of negotiations conducted at arm's

length.  *Id*. at 350-51.  It cautioned that "courts should not rely too heavily on comparisons with fees charged to mutual funds by other advisers" to their own captive mutual funds.  *Id*. at 350. "These comparisons are problematic because these fees, like those challenged, may not be the product of negotiations conducted at arm's length."  *Id.* at 350-351 (citing *Jones v. Harris Assocs. L.P.*, 537 F.3d 728, 731-32 (7th Cir. 2008) (Posner, J., dissenting).

For this reason, the incomplete excerpts of the Morningstar reports cited by Defendant (Def. Br. at 5-6), and attached as Exhibits G-J to the Thome Declaration, even if considered by the Court, are not probative.  They are based on so-called "peer group" comparisons between the advisory fees charged by FEIM to the Funds and the fees charged by other adviser-sponsors to their captive funds.  As Judge Posner explained: "The governance structure that enables mutual fund advisers to charge exorbitant fees is industry-wide, so [comparisons to the fees charged to other mutual funds] would if widely followed allow those fees to become the industry's floor." *Jones*, 537 F.3d at 732.

In any event, the Morningstar reports present merits issues inappropriate for resolution on this motion.  *See Millenco*, 2002 WL 31051604, at *4.

## VI.   DEFENDANT REALIZED ECONOMIES OF SCALE AND DID NOT APPROPRIATELY SHARE THE BENEFITS WITH THE FUNDS

"Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services.  Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale." *Migdal*, 248 F.3d at 326-27.

The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size. A portfolio

manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion. (Size may impair performance, but it imposes little logistical challenge.)

DAVID SWENSEN, UNCONVENTIONAL SUCCESS: A FUNDAMENTAL APPROACH TO PERSONAL INVESTMENT 238 (2005). Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." *Id.*

Plaintiffs' allegations demonstrate that, when coupled with the growth in AUM, Defendant's failure to institute breakpoints in the Funds' fee schedules has allowed Defendant to reap a windfall in the form of increased profits that are not justified by any change in the nature or quality of the services provided to the Funds. ¶¶ 84, 88-101.

**The Complaint Adequately Alleges that FEIM Realized Economies of Scale and Failed to Appropriately Share the Benefits with the First Eagle Funds.**

The factual allegations in the Complaint are more than sufficient to draw the plausible inference that Defendant benefitted from economies of scale and profited in managing the Funds while not appropriately sharing those benefits with the Funds.

Plaintiffs allege that (i) each Fund's AUM grew and remained substantially above historic assets levels, resulting in significant increases in the advisory fees charged to the Funds by Defendant; (ii) the increase in the Funds' AUM and advisory fees was not accompanied by a proportionate increase in the nature and quality of the services provided by Defendant or the effort required to perform those services; and (iii) the Funds' fee rates were not reduced through breakpoints or otherwise to reflect the economies of scale realized by Defendant. ¶¶ 80-90.

Plaintiffs' allegations here are of the same nature and specificity that the court found sufficient in *Kasilag*. As Plaintiffs do here, the plaintiffs in *Kasilag* alleged that the defendant's costs did not increase proportionately as the funds' AUM increased, resulting in the benefits of economies of scale accruing to the defendant. 2012 WL 6568409, at *6; *compare with* ¶ 84.

Even though the funds at issue in *Kasilag* had breakpoints, the plaintiffs there alleged that the captive fund's "fee schedule sets the initial breakpoints too high, spaces them too far apart, and reduces the fee by too small an amount to give Plaintiffs any meaningful benefit of the economies of scale."  2012 WL 6568409, at *6.   The court in *Kasilag* held:  "In light of these well-pleaded facts, Plaintiffs have sufficiently alleged that [the adviser-defendant's] breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds . . . . "  *Id.*

Here, there are *no* breakpoints in the Funds' investment advisory fee schedules such that the investment advisory fee rate paid by each Fund remains the same regardless of the amount of growth in the Funds' AUM (s*ee* ¶ 89), rendering them even more egregious than the fee schedules in *Kasilag*.   *See* U.S. SECURITIES AND EXCHANGE COMMISSION, DIVISION OF INVESTMENT MANAGEMENT, PROTECTING INVESTORS: A HALF CENTURY OF INVESTMENT COMPANY REGULATION 256 n.12 (May 1992) ("An advisory fee that does not scale down as company assets increase consequently may yield enormous profits to the adviser, to the detriment of shareholders.").[9]

Similarly, in *In re Federated*, the plaintiffs alleged that the fund's fee schedule, which, like here, contained no breakpoints, caused the advisory fees charged to the funds to double in the previous four years as the assets of the fund grew.  2009 WL 5821045, at *7.  This, plaintiffs argued, allowed the defendants to reap the benefit of economies of scale rather than passing them on to the plaintiffs' fund.  *Id.* at *6.  The court agreed, finding that "defendants have completely failed to pass along any economies of scale gained by the fund's growth over recent years . . . and instead have consumed these saving for their own benefit . . .  a practice which section 36(b)

---

[9]         Available at http://www.sec.gov/divisions/investment/guidance/icreg50-92.pdf.

was aimed at curtailing." *Id.* at *8. Here, the aggregate amount of investment advisory fees paid by the First Eagle Funds has increased by more than 134% between 2009 and 2013. ¶¶ 81, 83.

None of the authority cited by Defendant supports its position that the allegations regarding economies of scale pled here are insufficient. To the contrary, one case recognizes that allegations similar to those made here are sufficient. *See In re Goldman Sachs Mut. Funds Fee Litig.,* No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *9 n.24 (S.D.N.Y. Jan. 17, 2006) (acknowledging that, unlike the case before it, the plaintiffs in *Wicks* sufficiently pled economies of scale by alleging that "though fees had increased significantly over time, the quality of services rendered had not substantially changed"); *compare with* ¶ 84.

Of the other cases cited by Defendant on this point, three were dismissed only **after trial**. *See Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404 (2d Cir. 1989); *In re Am. Mut. Funds Fee Litig.,* No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009); *Kalish v. Franklin Advisers, Inc.,* 742 F. Supp. 1222 (S.D.N.Y. 1990). Those cases provide no support for dismissal of § 36(b) claims at the pleading stage.

Moreover, *Krinsk* involved money market funds, which require different services and involve different costs than mutual funds at issue here. *See Krinsk*, 875 F.2d at 406-07. Here, the investment advisory fees charged to the Funds cover investment advisory services, and the Funds pay separate fees for shareholder services. *See, e.g.*, ¶¶ 71-79. Accordingly, the failure by plaintiffs in *Krinsk* to prove at trial economies of scale with respect to shareholder services in connection with money market funds is inconsequential.

None of the other cases cited by Defendant involves factual allegations similar to those here regarding (i) a complete lack of any breakpoints in the funds' advisory fee schedule, or (ii) no change in services rendered. And the allegations in those cases were deficient for reasons not

present here. *See, e.g.*, *Yampolsky v. Morgan Stanley Inv. Advisers Inc.*, No. 03 Civ. 5710, 2004 WL 1065533 (S.D.N.Y. May 12, 2004), *aff'd sub nom., Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 344 (2d Cir. 2006) (plaintiffs "'failed to allege any facts pertinent to th[e] relationship between fees and services'" (alteration in original) (citation omitted)); *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140, at *4 (S.D.N.Y. Mar. 20, 2009) (finding an "absence of facts sufficient to provide context for any *Gartenberg* factor that would support Plaintiffs' claims of excessive fees…." ); *Hoffman v. UBS-AG,* 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (finding allegations regarding economies of scale deficient where plaintiffs acknowledged in their Complaint that advisers and subadvisers "perform[ed] distinct services"); *In re Franklin Mut. Fund Fees Litig.,* 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (dismissing entire action as preempted by SLUSA and also noting that plaintiffs never "address the actual services rendered to th[e] Funds"); *In re Scudder Mut. Funds Fee Litig.,* No. 04 Civ. 1921, 2007 WL 2325862, at *17 (S.D.N.Y. Aug. 14, 2007) (plaintiffs failed to allege that fees were excessive, or disproportionate to the services rendered, and alleged economies of scale related to funds in which no named plaintiffs had invested or to time periods far outside the statute of limitations); *In re Goldman Sachs*, 2006 WL 126772, at *9 ("[P]laintiffs rely on allegations regarding *Rule 12b-1* fees, which are inappropriate to establish that the *advisory* fees were excessive.").[10]

Ultimately, to **prove** the economies of scale realized by the Defendant will require certain financial information, such as Defendant's internal costs, which must be obtained in discovery. Indeed, data regarding investment adviser's operations are not readily available even to the SEC,

---

[10]     Defendant also relies on *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332 (S.D.N.Y. 2007). But, in that case, the plaintiffs failed to allege anything about the services offered to the fund in relation to the fees charged. *Id.* at 338. In any event, the Second Circuit reinstated certain § 36(b) claims, notwithstanding any purported deficiencies in the allegations about economies of scale. *See R.W. Grand Lodge*, 425 Fed. Appx. at 31.

much less to fund shareholders.  *See* U.S. SECURITIES AND EXCHANGE COMMISSION, DIVISION OF INVESTMENT MANAGEMENT: REPORT ON MUTUAL FUND FEES AND EXPENSES (Dec. 2000), *available at* http://www.sec.gov/news/studies/feestudy.htm ("2000 SEC Report") (concluding that "we cannot analyze directly the cost of providing portfolio management services to a mutual fund in order to determine whether economies exist (because the data are unavailable)").  Under *Twombly* and *Iqbal*, at the pleading stage, "[a]ll that is necessary is that a plaintiff set forth enough factual matter to show the claimed entitlement to relief is plausible on its face and there is a reasonable expectation that discovery will produce evidence to support the claim."  *In re Federated,* 2009 WL 5821045, at *3.

Finally, Defendant asserts that there are "[o]ther ways to share economies of scale with fund investors" other than through breakpoints, Def. Br. at 17.  Yet, even assuming those so-called "other ways" are effective to share economies of scale, Defendant does not claim that it employs any of them.  Even if it did, the sufficiency of any such sharing—which Defendant does not quantify—is a merits argument that cannot be resolved on this motion.  *See Curran*, 2010 WL 2889752, at *9 (finding that the question of whether shareholders actually benefitted from economies of scale would require a "factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion, where the Court must take Plaintiffs' factual allegations as true and make all reasonable inferences in favor of Plaintiffs"); *Ruffin*, 2014 WL 3828408, at *2 (holding that a Rule 12(b)(6) motion does not resolve disputed facts or decide the merits of the case).

## VII.   APPROVAL OF THE ADVISORY FEES BY THE BOARD IS ENTITLED TO LITTLE OR NO DEFERENCE

The Court in *Jones* held that "a measure of deference to a board's judgment may be appropriate in some instances," but "the appropriate measure of deference varies depending on the circumstances."  *Jones*, 559 U.S. at 349.

> [W]here the board's process was deficient or the adviser withheld important
> information, the court must take a more rigorous look at the outcome.  When an
> investment adviser fails to disclose material information to the board, greater
> scrutiny is justified because the withheld information might have hampered the
> board's ability to function as an independent check upon the management.

*Id.* at 351-52 (quotation marks and citations omitted).

Consistent with Congress's intent "not to rely solely on the fund's directors to assure reasonable adviser fees" and to establish § 36(b) as an "independent check[] on excessive fees," *Daily Income Fund*, 464 U.S. at 540-41, the Court in *Jones* emphasized that even a "robust" process will not by itself insulate the adviser from liability for excessive fees.  *See Jones*, 559 U.S. at 351 ("This is not to deny that a fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee 'is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.'" (citation omitted)).

Plaintiffs adequately allege that the board approval process for the Funds was "deficient," rather than "robust," and, therefore, the Funds' fees should be subject to "greater scrutiny" under *Jones*.  The approval process was neither competitive nor conducted at arm's length, in contrast to the process by which the adviser-sponsor of the Subadvised Fund selects an investment adviser for its fund. ¶¶ 93-108.  For example, whereas the adviser-sponsor of the Subadvised Fund solicited proposals from multiple candidates and negotiated with the candidates regarding the fees to be charged (¶¶ 104-108), the Board has not solicited proposals from other investment advisers to provide investment advisory services to the First Eagle Funds (¶ 100).  Further, the Board has not negotiated a "most favored nation" provision into the IAC, which would enable the Funds to benefit from fees negotiated at arm's length even if the Board did not engage in such negotiations with FEIM. ¶ 101.

Moreover, the Board, *inter alia*:  (i) relied on information and analyses that FEIM prepared or were designed to support FEIM's rationalization for the fees charged to the Funds; (ii) did not consider information or analyses reflecting the interests of the Funds when assessing the investment advisory fees or FEIM's rationalization for those fees; (iii) approved the IAC charging the Funds investment advisory fees as much as 97% higher than other mutual fund clients pay FEIM for the same or substantially the same services; (iv) accepted FEIM's representations that the lower fees paid by other clients reflect differences in the services provided to those clients without appropriately examining whether the services actually are different and without considering information necessary to assess whether the difference in fees is warranted by any purported differences in the services provided; (v) approved advisory fee arrangements (which include no breakpoints) that enable FEIM to retain for itself the vast majority of the benefits of economies of scale without appropriately sharing those benefits with the Funds; and (vi) did not devote adequate time to their consideration of the Funds' advisory contracts.  ¶¶ 5, 89, 93-98.

Courts have found similar allegations sufficient to withstand a motion to dismiss.  For example, in *Reso*, the plaintiff alleged that defendants "fail[ed] to provide the directors with 'sufficient, complete, and/or accurate information' or meaningful information about economies of scale, while also providing 'misleading information to the directors.'"  2011 WL 5826034, at *6.  Recognizing the evidentiary difficulties associated with pleading facts regarding a board of directors' approval process, the court deemed those allegations "to be specific enough to raise an inference of lack of independence." *Id*.  The court further added that it "cannot expect [plaintiff] to know or outline the exact contours of the directors' decision-making processes." *Id*.

Similarly, in *Hunt*, the plaintiffs alleged that "Defendants failed to provide the trustees with sufficient information regarding Defendants' fees and other compensation to allow the trustees to fulfill their obligations as 'watchdogs' for the funds." 2006 WL 1581846, at *4. The plaintiffs further alleged that the trustees failed to exercise care and conscientiousness in their review of the fees. *Id*. In denying defendant's motion to dismiss, the court held "a failure of the trustees to receive full information and act conscientiously may be indicative of a breach of fiduciary duty under section 36(b)." *Id*. *See also Dumond*, 2006 WL 149038, at *3 (denying motion to dismiss where plaintiffs alleged that "defendants provided the trustess [sic] with virtually no information regarding the advisory fees being charged to non-MFS Fund clients and the economies of scale or fall-out benefits received by the defendants, the trustees failed to request and evaluate information reasonably necessary to make an informed decision regarding the MFS Funds' distribution plans, and the trustees rarely, if ever, questioned any information or recommendations provided by the defendants").

The cases cited by Defendant with respect to the board approval process do not support dismissal here. *See Migdal*, 248 F.3d at 328 ("[P]laintiffs assert that they do not need to allege excessive fees because they instead alleged that the directors of the funds were not independent."); *Krantz v. Prudential Inv. Fund Mgm't LLC*, 77 F. Supp. 2d 559, 563 (D.N.J. 1999) ("The only factual allegation plaintiff does include in the Amended Complaint—that the Fund's directors serve on boards of multiple funds for which they receive significant compensation—fails to state a claim for relief."). For the same reason, Defendant's reliance on *Amron*, 464 F.3d at 344-45, for the mundane proposition that service on multiple boards of other

mutual funds is insufficient as a matter of law to challenge trustee independence (Def. Br. at 18-19), misses the mark. [11]

Plaintiffs have set forth facts and circumstances, which when read as a whole, plausibly support their allegations that the Board's approval process was deficient and, therefore, should be afforded little deference, requiring the court to "take a more rigorous look at the outcome." *Jones*, 559 U.S. at 351.

In any event, even if the board approval process had been "robust," Plaintiffs state a claim under § 36(b) based on allegations that Defendant charges significantly higher fees to the Funds than are charged to the Subadvised Fund for the same or substantially the same services and have failed to appropriately share the benefits of economies of scale with the Funds. *See Jones*, 559 U.S. at 351 ("[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information . . . .").

## CONCLUSION

Judged under the standard set forth in *Jones*, Plaintiffs' Complaint, taken as a whole, states a plausible claim for relief under § 36(b). For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

---

[11]    Further, in contrast to Plaintiffs' Complaint here, the complaint in *Amron* failed to allege any facts supporting an inference that the challenged fees were disproportionate to the services provided and, therefore, failed to state a claim under § 36(b) irrespective of the allegations regarding the board approval process. 464 F.3d at 344.

Dated:  September 11, 2014

SCHNADER HARRISON
SEGAL & LEWIS LLP

_/s/  Richard A. Barkasy_

Richard A. Barkasy (#4683)
Fred Hoensch (#5761)
824 N. Market Street, Suite 800
Wilmington, DE 19801
Tel: (302) 888-4554
Fax: (302) 888-1696

ZWERLING, SCHACHTER &
ZWERLING, LLP

Robin F. Zwerling (admitted *pro hac vice*)
Jeffrey C. Zwerling (admitted *pro hac vice*)
Susan Salvetti (admitted *pro hac vice*)
Andrew W. Robertson (admitted *pro hac vice*)
41 Madison Avenue
New York, NY 10010
Tel: (212) 223-3900
Fax: (212) 371-5969

*Attorneys for Plaintiffs*

34