**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE LYNN M. KENNIS TRUST U/A DTD 10/02/2002, BY LYNN M. KENNIS AS TRUSTEE, and THE RONALD J. KENNIS TRUST, BY RONALD J. KENNIS AND DOLORES M. KENNIS AS TRUSTEES,<br><br>                                        Plaintiffs,<br><br>          v.<br><br>FIRST EAGLE INVESTMENT MANAGEMENT, LLC,<br><br>                                        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 14-585-(SLR/SRF)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
FIRST EAGLE INVESTMENT MANAGEMENT, LLC'S MOTION TO DISMISS**

Of Counsel:

Lori A. Martin
Brad E. Konstandt
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Lori.Martin@wilmerhale.com
Brad.Konstandt@wilmerhale.com

Matthew T. Martens
Matthew J. Thome
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
Matthew.Martens@wilmerhale.com
Matthew.Thome@wilmerhale.com

Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for Defendant
First Eagle Investment Management, LLC*

Dated:  October 9, 2014

# **TABLE OF CONTENTS**

I.       INTRODUCTION ................................................................................................................1

II.      THE COMPLAINT IS BASED UPON UNFOUNDED SPECULATION AND
         INADEQUATE FEE COMPARISONS. ............................................................................3

   A.    Plaintiffs' Allegations Regarding the Sub-Advisory Fees First Eagle Receives from
         Mercer Are Pure Speculation. ........................................................................................4

   B.    Even If Plaintiffs Had Adequately Alleged the Sub-Advisory Fee That First Eagle
         Charges the Mercer Fund, That Fact Alone Would Not State a Claim
         Under § 36(b). .................................................................................................................7

   C.    The Mercer Fund Is Not An Apt Comparison to the Overseas Fund...........................11

III.     PLAINTIFFS' ECONOMIES OF SCALE ALLEGATIONS ARE TOO
         CONCLUSORY TO STATE A CLAIM. .........................................................................13

IV.      PLAINTIFFS FAIL TO ALLEGE DEFICIENCIES IN THE BOARD'S FEE
         APPROVAL PROCESS. ..................................................................................................16

CONCLUSION................................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Am. Chems. & Equip., Inc. 401(k) Ret. Plan v. Principal Mgmt. Corp.*,
    No. 4:14-cv-00044-JAJ (S.D. Iowa Sept. 10, 2014)............................................................10, 14

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
    464 F.3d 338 (2d Cir. 2006).........................................................................................................3, 17

*Benak v. Alliance Cap. Mgmt. L.P.*,
    No. 01-5734, 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ......................................................10

*Brinkmeier v. Graco Children's Prods., Inc.*,
    767 F. Supp. 2d 488 (D. Del. 2011)...........................................................................................4, 6

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014).............................................................................................................15

*Curran v. Principal Mgmt. Corp.*,
    No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010)...........................5, 6, 8, 9

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
    694 F.2d 923 .........................................................................................................................................16

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)...............................................................................10, 14

*Hunt v. Invesco Funds Group, Inc.*,
    No. 04-CV-2555, 2006 WL 1581846 (S.D. Tex. June 5, 2006).........................................8, 18

*In re Am. Mutual Funds Fee Litig.*,
    No. CV 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ...........................................15

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)...........................................................................................................11

*In re Federated Mutual Funds Excessive Fee Litig.*,
    No. 2:04cv352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ...........................................8, 14

*In re Salomon Smith Barney Mutual Fund Fees Litig.*,
    528 F. Supp. 2d 332 (S.D.N.Y. 2007), *aff'd in part, vacated in part sub nom.*, *R.W.*
    *Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 F.
    App'x 25 (2d Cir. 2011)...........................................................................................................13, 14

*In re Scudder Mutual Fund Fees Litig.*,
    No. 04 Civ 1921, 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ...........................................13

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)...................................................................................................9, 11, 16

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
    No. 11-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012).....................................................9, 14

*Krantz v. Prudential Inv. Fund Mgmt. LLC*,
    305 F.3d 140 (3d Cir. 2002)...............................................................................................3

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989)..............................................................................................17

*Migdal v. Rowe-Price-Fleming Int'l*,
    248 F.3d 321 (4th Cir. 2001) ............................................................................................17

*Mintz v. Baron*,
    No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) .................................11, 12, 14

*Pension Trust Fund for Operating Engineers v. Mortg. Asset Sec. Trans., Inc.*,
    730 F.3d 263 (3d Cir. 2013)..........................................................................................7, 11

*Pope v. Fed. Home Loan Mortg. Corp.*,
    561 Fed. App'x 569 (8th Cir. 2014) ....................................................................................4

*R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*,
    425 F. App'x 25 (2d Cir. 2011) ..........................................................................................9

*Reso v. Artisan Partners Ltd. P'ship*,
    No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011)................................... passim

*Sins v. Janus Capital Mgmt., LLC*,
    No. 04-cv-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ..............................................8

*Strougo v. BEA Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002)..................................................................................17

## OTHER AUTHORITIES

*In re: MGI Funds & Mercer Global Inv., Inc.*,
    SEC Release No. 27200, 87 SEC Docket 99 (Dec. 28, 2005)..................................................7

## I.      INTRODUCTION

Plaintiffs' Opposition makes clear that their claims against First Eagle are unprecedented. Plaintiffs have filed a § 36(b) claim alleging, based on so-called "information and belief," that the fees First Eagle receives as an *adviser* to its Global and Overseas Funds are higher than the fees Plaintiffs *speculate* that First Eagle receives as a *sub-adviser* to the Mercer Global Low Volatility Equity Fund (the "Mercer Fund").  Yet Plaintiffs have not identified a single case in which a court allowed a § 36(b) claim to proceed based solely on a comparison of the adviser's fee to a single, unknown fee that the adviser receives for providing sub-advisory services to another client.  Plaintiffs' first-of-its-kind Complaint should be dismissed for several reasons:

*First*, Plaintiffs do not know the fee that First Eagle receives as a sub-adviser to the Mercer Fund – the central fact necessary to their theory of liability.  Nor have Plaintiffs alleged a reasonable basis from which to infer what that fee is.  Plaintiffs allege that the sub-advisory fees that non-party Mercer pays to *other* sub-advisers of its *other* funds are between 25 and 37 basis points lower than the advisory fees that Mercer receives from those funds.  From this, Plaintiffs leap to the conclusion that First Eagle must also be receiving a sub-advisory fee between 25 and 37 basis points lower than Mercer's advisory fee for its work with respect to the Mercer Fund. The flaw in this conclusion is the absence of allegations that First Eagle's sub-advisory arrangement with regard to the Mercer Fund is similar to the arrangements those other advisers have with the other Mercer funds.  Accordingly, Plaintiffs' supposed "information and belief" concerning the sub-advisory fees that First Eagle receives with regard to the Mercer Fund is, in fact, nothing more than rank speculation.

*Second*, even had Plaintiffs adequately alleged the fee that First Eagle receives as a sub-adviser to the Mercer Fund, that alone would not be sufficient to state a claim under § 36(b). None of the cases cited by Plaintiffs allowed a case to proceed based on the fee the investment

adviser received as a sub-adviser to one other fund as *the only data point* in evaluating the reasonableness of its fee as an adviser.  It cannot be the case that an adviser is subject to a § 36(b) suit simply because the adviser charges a fee to one fund that differs from the fee charged to even one other client, particularly when the comparison point is a sub-advisory fee. Indeed, none of the cases cited by Plaintiffs sustained a § 36(b) claim based on fee comparison allegations alone, much less based on a single-example comparison.

*Third*, Plaintiffs apply their fee comparison approach to both First Eagle's Global Fund and its Overseas Fund without alleging facts from which the Court could infer that the Overseas Fund is an apt comparison to the Mercer Fund.  Absent those allegations, the sub-advisory fees charged to the Mercer Fund say nothing about the reasonableness of the advisory fees charged to the Overseas Fund.  Accordingly, even if Plaintiffs have alleged a fee disparity sufficient to state a claim with regard to the fee First Eagle receives for advising the Global Fund, their claim involving the Overseas Fund should nonetheless be dismissed.

*Finally*, Plaintiffs' attempt to shore up their unprecedented effort at a fee comparison by including allegations regarding other *Gartenberg* factors also fails.  Courts have repeatedly held that allegations similar to those Plaintiffs make with respect to economies of scale are insufficient as a matter of law, and Plaintiffs cite no persuasive authority to the contrary. Similarly, Plaintiffs' attempt to challenge the independence and the conscientiousness of the Board of Trustees that approved the fee arrangements between First Eagle and the Global and Overseas Funds does nothing to overcome the deference the courts must afford the Board's decision-making.  Accordingly, Plaintiffs' Complaint should be dismissed.

## II.     THE COMPLAINT IS BASED UPON UNFOUNDED SPECULATION AND INADEQUATE FEE COMPARISONS.

Plaintiffs' Opposition does not address the glaring hole in the theory of liability underlying their Complaint: ***Plaintiffs admit that they do not know the sub-advisory fee First Eagle charges the Mercer Fund.*** (Compl. ¶ 63.)  Rather, the Complaint *guesses* about the range of sub-advisory fees that *might* be paid to First Eagle as a sub-adviser to the Mercer Fund.  For this reason, Plaintiffs have no factual basis to assert that the fees the Global and Overseas Funds pay are excessive in comparison to the fees charged to the Mercer Fund.  This is fatal to Plaintiffs' claims, as the courts have made clear that, at the pleading stage, a plaintiff alleging a § 36(b) claim must "set forth those *facts* necessary to a finding that the [challenged] fees were excessive," particularly "*facts* pertinent to the relationship between fees and services."  *Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (emphases added); *see also Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002) (same; dismissing § 36(b) action where plaintiffs "failed to allege any facts indicating that the fees received were disproportionate to services rendered").  Absent these facts, Plaintiffs cannot simply pronounce that First Eagle's fees might be "excessive."

Plaintiffs attempt to plead around their lack of knowledge by alleging the sub-advisory fee charged by First Eagle based on "information and belief."  But the requisite "information" on which Plaintiffs' "belief" rests has not been alleged here.  And even were the belief based on more than imagination, pointing to nothing more than a disparity between the fee that First Eagle receives for providing ***sub-advisory*** services to ***a single fund*** and the fee First Eagle receives as ***adviser*** for the Global and Overseas Funds is not enough to state a claim under § 36(b).

### A.    Plaintiffs' Allegations Regarding the Sub-Advisory Fees First Eagle Receives from Mercer Are Pure Speculation.

The ability to plead facts on "information and belief" is not a free pass for Plaintiffs to engage in unsupported speculation.  Even when pleading based on "information and belief," a plaintiff must still provide *facts* from which one could plausibly infer the fact alleged on information and belief.  *See Pope v. Fed. Home Loan Mortg. Corp.*, 561 Fed. App'x 569, 573 (8th Cir. 2014) (pleading insufficient where plaintiffs alleged the existence of an unrecorded assignment on information and belief but "provide[d] no facts that would lead to the plausible inference that an unrecorded assignment does exist"); *Brinkmeier v. Graco Children's Prods., Inc.*, 767 F. Supp. 2d 488, 496 (D. Del. 2011) (allowing allegations pled on information and belief "so long as there is a proper factual basis asserted to support the beliefs pled").  Here, Plaintiffs have failed to plead a proper factual basis for their "information and belief" allegation that First Eagle charges the Mercer Fund a sub-advisory fee of between 38 and 50 basis points.

Plaintiffs contend they have pled a proper factual basis for their "belief" by alleging that they "have determined that Mercer pays subadvisory fee rates that are, on average, between 25 and 37 basis points lower than the investment advisory fee rates that Mercer charges its captive funds."  (D.I. 21 at 17.)  Plaintiffs then surmise that Mercer must also be paying First Eagle a sub-advisory fee rate for providing sub-advisory services to the Mercer Fund that is also between 25 and 37 basis points lower than Mercer's investment advisory fee rate of 75 basis points for that fund, *i.e.*, a fee between 38 and 50 basis points.

This methodology is flawed because it assumes – without any alleged basis – that Mercer's sub-advisory arrangement with First Eagle is comparable to Mercer's other sub-advisory arrangements such that one can infer that the ratio between the sub-advisory fee and investment adviser fee is the same for all of Mercer's sub-advisory arrangements.  But the

Complaint contains no allegations regarding the similarity of the funds, the services provided by the sub-advisers to these five other funds, the services provided by Mercer to the other funds, or how Mercer has structured its sub-advisory arrangements with those other sub-advisers. Plaintiffs do not even identify the other sub-advisers to Mercer. Indeed, there are no allegations at all about the other arrangements, other than that they are sub-advisory arrangements to which Mercer is a party (and First Eagle is not).

Absent allegations that Mercer's other sub-advisory agreements are similar to its sub-advisory agreement with First Eagle, a comparison to the sub-advisory fees paid by Mercer under *other* sub-advisory agreements for *other* mutual funds sheds no light at all on what the sub-advisory fee between Mercer and First Eagle might be for the Mercer Fund. There is simply not enough factual matter to support an inference that First Eagle's sub-advisory arrangement with Mercer has a fee structure similar to Mercer's arrangements with these other sub-advisers. There is certainly no reason to conclude – as Plaintiffs apparently do – that the sub-advisory fee that First Eagle receives from Mercer must be between 25 and 37 basis points lower than Mercer's investment advisory fee rate of 75 basis points simply because the sub-advisory fee rates that Mercer pays sub-advisers to five other funds (not First Eagle or First Eagle Funds) are between 25 and 37 basis points lower than Mercer's advisory fee rate for those other funds.

Plaintiffs assert that the courts in *Reso v. Artisan Partners Limited Partnership*, No. 11-CV-873, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011), and *Curran v. Principal Management Corp.*, No. 4:09-cv-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010), upheld § 36(b) claims based upon similarly pled "information and belief" allegations. (D.I. 21 at 16.) In fact, there is no indication in either case that those plaintiffs relied on information and belief ***to allege the fees*** that the defendants charged other clients.

In *Reso*, unlike here, the plaintiff made specific allegations that the fees charged by the defendant-adviser to the funds at issue were higher than those the defendant-adviser charged to other funds it managed.  2011 WL 5826034, at *8; *see also id.* at *2.  The information and belief allegations discussed in the court's opinion related only to the services provided by the defendant-adviser.  *Id.* at *8.  Similarly, in *Curran*, the plaintiffs "detail[ed] the advisory fees charged by [the defendant] and the subadvisers, showing that [the defendant] collects substantially higher fees than the subadvisers from each of the Subject Funds."  2010 WL 2889752, at *8.  Again, the information and belief allegations referenced by the court concerned the services provided.  *Id.*  Thus, at most, those cases stand for the unremarkable proposition that "information and belief" allegations *may* be appropriate, but they do not support pleading on information and belief without a plausible factual basis – particularly where the allegation at issue is the crux of the entire claim.[1]

Plaintiffs also attempt to avoid the core deficiency in their Complaint by shifting the pleading burden to Defendant and chastising First Eagle for not providing "the one page from its subadvisory agreement with Mercer that could demonstrate conclusively whether the fees it receives from Mercer are within or outside of the 38 to 50 basis point range alleged by Plaintiffs."  (D.I. 21 at 18-19.)  But First Eagle is under no obligation to disclose what amounts

---

[1]     Plaintiffs also cite *Brinkmeier v. Graco Children's Products, Inc.*, a case that is wholly inapposite.  (D.I. 21 at 16, 18.)  In *Brinkmeier*, a *qui tam* action alleging false patent marking, the court permitted the plaintiff to plead scienter allegations on information and belief because the facts related to state of mind.  Even there, the court made clear that the plaintiff "must still set forth the specific facts upon which the belief is reasonably based."  767 F. Supp. 2d at 496.

to confidential business information in order to fend off a speculative complaint.[2]  It is Plaintiffs'

obligation at the pleading stage to allege facts to support its claim, and Plaintiffs cite no authority

for the proposition that, in response to a motion to dismiss, a defendant must either reveal

confidential business information or suffer the inference that a plaintiff's speculative allegations

are true.  *See Pension Trust Fund for Operating Engineers v. Mortg. Asset Sec. Trans., Inc.*, 730

F.3d 263, 268 (3d Cir. 2013) ("We must accept all well-pleaded factual allegations in the

complaint as true . . . but we are not compelled to accept unsupported conclusions and

unwarranted inferences, or a legal conclusion couched as a factual allegation." (internal

quotation marks omitted)).

> **B.     Even If Plaintiffs Had Adequately Alleged the Sub-Advisory Fee That First Eagle Charges the Mercer Fund, That Fact Alone Would Not State a Claim Under § 36(b).**

Plaintiffs wrongly believe that their fee comparison allegations with respect to the Mercer

Fund, standing alone, state a claim for relief under § 36(b).  Although they argue that

"[n]umerous courts . . . have denied motions to dismiss § 36(b) claims where plaintiffs asserted

that the adviser-defendant charged lower fees to other clients for the same or substantially the

same investment advisory services" (D.I. 21 at 22), any fair reading of the cases cited by

Plaintiffs makes clear that their theory of liability here is unprecedented.  None of the cases cited

by Plaintiffs allowed a case to proceed based ***solely*** on a fee comparison that used, as its only

reference point, a ***single*** fee the investment adviser received for providing ***sub-advisory*** services.

---

[2]     The sub-advisory fee paid to Mercer is confidential business information that remains
undisclosed because the SEC has granted ***to non-party Mercer*** an exemptive order allowing such
non-disclosure.  *See* D.I. 17, Ex. L at 111; *see also In re: MGI Funds & Mercer Global Inv., Inc.*,
SEC Release No. 27200, 87 SEC Docket 99 (Dec. 28, 2005) (order allowing MGI Funds and
Mercer Global Investments, Inc. "to enter into and materially amend subadvisory agreements
without shareholder approval and grant relief from certain disclosure requirements").

In *Reso*, for example, the plaintiff identified at least *three* examples of accounts that received investment advisory services from the defendant at lower rates and also included allegations comparing the fees charged by the defendant with the fees charged by other advisers to other funds.  2011 WL 5826034, at *2, *9.  Moreover, the defendant's fees in *Reso* ranked "in the highest 40% of those charged by similar mutual funds," and the defendant had "received a grade of 'F' for its fees from Morningstar."  *Id.*[3]

Similarly, in *In re Federated Mutual Funds Excessive Fee Litigation*, the plaintiff alleged that the defendants charged lower fees to other funds within the same mutual fund complex, that *three* competing funds received sub-advisory services from the defendants for lower fees, and that the average fee charged to comparable mutual funds by other advisers was lower than the fee charged by the defendants.  No. 2:04cv352, 2009 WL 5821045, at *5-6 (W.D. Pa. Sept. 30, 2009).  There again, the court noted that the fund at issue received "very poor ratings" from Morningstar and "ha[d] the highest expense ratio of all the 266 large open-ended funds evaluated by Morningstar."  *Id.* at *6-7.  The fee comparison allegations in *Hunt v. Invesco Funds Group, Inc.* included a comparison to the advisory fees the defendants charged for providing pension portfolio advisory services, a comparison to the average advisory fees charged for peer mutual funds, and "*several* examples of lower fees charged by Defendants for advising other funds." No. H-04-02555, 2006 WL 1581846, at *3 (S.D. Tex. June 5, 2006) (emphasis added).  And in *Sins v. Janus Capital Management, LLC*, the plaintiff provided a comparison to "advisor *and*

---

[3]     Here, by contrast, Morningstar rates the fee levels of the Funds as either "Below Average" or "Low."  *See* D.I. 16 at 6.  Although Plaintiffs claim that the Court should not take judicial notice of Morningstar materials, the court in at least one of the cases cited by Plaintiffs did so, s*ee Curran*, 2010 WL 2889752, at *1 n.1, and plaintiffs in investment adviser fee cases often include in their complaints allegations about Morningstar ratings.  *See Reso*, 2011 WL 5826034, at *7; *Hunt*, 2006 WL 1581846, at *3 n.2.  That Plaintiffs here did not include such allegations illustrates how different this case is from the cases on which they rely.

sub-advisor fees charged to third parties."  No. 04-cv-01647, 2006 WL 3746130, at *1 (D. Colo.

Dec. 15, 2006) (emphasis added).[4]

The differences between the facts in those cases and the allegations here illustrate just

how thin Plaintiffs' claims are.  Plaintiffs ask this Court to allow them to rest their fee

comparison on a single (manufactured) data point.  But § 36(b) does not require parity in the fees

an investment adviser charges to its various clients, and the Supreme Court has recognized that

there will be a *range* of acceptable fees.  *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 347, 350

(2010) (plaintiff must "show that the fee is outside the *range* that arm's-length bargaining would

produce" (emphasis added)).  By using only a single supposed data point, however, Plaintiffs

provide no context for evaluating whether the fees First Eagle receives from the Global and

Overseas Funds fall outside of the *range* of acceptable fees.  Indeed, if Plaintiffs' theory were

adopted, an investment adviser would be subject to a § 36(b) suit any time it charged fees

differing from even one other client, thus effectively requiring investment advisers to provide the

same deal to all similar funds.  Section 36(b) imposes no such duty.

---

[4]     Plaintiffs also cite cases where courts allowed § 36(b) claims to proceed when the
plaintiffs alleged that the investment adviser's fees were excessive because it paid sub-advisers
to perform virtually all of the investment management services that the adviser provided to the
funds at a fraction of the fee the adviser charged.  *See Kasilag v. Hartford Inv. Fin. Servs., LLC*,
No. 11-1083, 2012 WL 6568409, at *3 (D.N.J. Dec. 17, 2012); *Curran*, 2010 WL 2889752, at
*8-9.  Here, by contrast, there is no allegation that First Eagle hired a sub-adviser to provide any
investment management services to the Funds.  Moreover, in both cases cited, the plaintiffs
*specifically identified* the higher fee charged for allegedly similar services, which Plaintiffs fail
to do here.  *See Kasilag*, 2012 WL 6568409, at *3 (plaintiffs specified the fees charged to the
funds and those charged to the sub-advisors after the court permitted the plaintiffs to "replead
th[e] allegation with greater specificity"); *Curran*, discussed *supra* at 6.

        Plaintiffs' citation to *R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap
Value Fund*, 425 F. App'x 25 (2d Cir. 2011), is also inapposite, as it involved a scheme whereby
the defendants "knowingly inflated the price of the transfer agent services provided to Plaintiffs
and pocketed the difference between what they charged and what the services were worth."  *Id.*
at 31.  The allegations in *R.W. Grand Lodge* are not analogous to the complaint in this litigation
either with respect to content or the specificity of pleading.

Plaintiffs' argument is further weakened by the fact that the single supposed data point on which it relies is not a fee First Eagle charges as an adviser, but rather as a sub-adviser. "[I]nvestment advisers and sub-advisers perform distinct services." *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (finding "irrelevant" a plaintiff's claims concerning a differential in breakpoints between sub-advisers and investment advisers). The fees an investment adviser receives for providing sub-advisory services are not probative of the appropriate range of fees that the investment adviser should receive for providing investment advisory services to its own funds.

Finally, in none of the cases Plaintiffs cite did a court sustain a § 36(b) claim based on fee comparison allegations alone. The cases Plaintiffs cite all included additional allegations addressed to other *Gartenberg* factors, and Plaintiffs point to no precedent for allowing a § 36(b) claim to advance based solely on fee comparison allegations. For example, in *American Chemicals & Equipment, Inc. 401(k) Retirement Plan v. Principal Management Corp.*, cited by Plaintiffs as supplemental authority (D.I. 22), the plaintiff "made *factual* allegations relating to each *Gartenberg* factor." No. 4:14-cv-00044-JAJ, at 6 (S.D. Iowa Sept. 10, 2014) (emphasis added).[5] *Cf. Benak v. Alliance Cap. Mgmt. L.P.*, No. 01-5734, 2004 WL 1459249, at *9 (D.N.J. Feb. 9, 2004) (observing that "one factor, in and of itself, is not dispositive," and that "Plaintiff has not pointed to a single case where allegations of excessive fees were sustained on the basis of only one of the six factors"). Accordingly, even if the fee comparison allegations in the

---

[5]    The *American Chemicals* case is inapposite for additional reasons. For example, the plaintiff in that case alleged that the defendant-adviser improperly retained half of an "acquired fund fee" that was split with the sub-advisers, even though the defendant-adviser performed no services for that fee. *American Chem. & Equip., Inc. 401(k) Ret. Plan v. Principal Mgmt. Corp.*, No. 4:14-cv-00044-JAJ, at 2, 7 (referring to plaintiff's allegation that the defendant-adviser's receipt of the fee constituted "something for nothing"). There is no allegation in this case that First Eagle hired sub-advisers or charged fees for work it did not perform. *See also supra* n.4.

Complaint were well-founded – which they are not – Plaintiffs should still be required to plead adequately the existence of other *Gartenberg* factors.  As discussed in Sections III and IV below, they have not done so.

### C.     The Mercer Fund Is Not An Apt Comparison to the Overseas Fund.

The Court should also dismiss Plaintiffs' claim with respect to the fees First Eagle received from the Overseas Fund for the independent reason that there is no allegation that the Mercer Fund is an apt comparison to the Overseas Fund.  As the Supreme Court has made clear, "courts must be wary of inapt [fee] comparisons" and should reject comparisons when "the services rendered are sufficiently different."  *Jones*, 559 U.S. at 350.  Here, the Overseas Fund differs from the Mercer Fund and the Global Fund in fundamental ways.  These differences are readily identifiable in the funds' prospectuses, which the Court may properly consider on a motion to dismiss where, as here, the complaint relies on those prospectuses.[6]

*First*, the Overseas Fund employs a different investment strategy from the Global Fund and the Mercer Fund.  The prospectuses explain that the Overseas Fund will normally invest at least 80% of its total assets in foreign securities, whereas the Global Fund generally allocates only 40% or more of its assets to foreign investments and the Mercer Fund ordinarily invests only 40-60% of its assets in equity securities of foreign issuers.[7]  Further, unlike the Global Fund and the Mercer Fund, the Overseas Fund invests primarily in "mature" foreign markets.[8]

---

[6]      *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, 730 F.3d 263, 265 n.1 (3d Cir. 2013); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140, at *3 (S.D.N.Y. Mar. 20, 2009).  Plaintiffs do not appear to challenge the propriety of the Court's consideration of the prospectuses cited in the Complaint.  *See* D.I. 21 at 19.

[7]      D.I. 17 Ex. A at 6 (Global Fund); *Id.* at 13 (Overseas Fund); D.I. 17 Ex. L at 36 (Mercer Fund).

[8]      D.I. 17 Ex. A at 12.

*Second*, the prospectuses make clear that the Overseas Fund and the Mercer Fund have different performance benchmarks.[9]  This fact is important to assessing Plaintiffs' claims because a performance benchmark is an indicator of the class of funds to which a fund belongs and to which it should be compared.  Here, the difference in performance benchmarks for the Overseas Fund and the Mercer Fund is a strong indicator that Plaintiffs are engaging in an inapt comparison.  All Plaintiffs offer in response are allegations about generic factors – foreign stocks, common portfolio managers and some administrative overlap (D.I. 21 at 19) – but these overbroad similarities between the Overseas Fund and the Global Fund do not establish that the Mercer Fund is a valid comparison for the Overseas Fund.

*Third*, Plaintiffs seek to elide the differences between the Global Fund and the Overseas Fund in operating expenses, investment turnover rates, and rates of return (D.I. 21 at 20), but these differences all bear on the propriety of a fund's advisory fees.  *Cf. Mintz*, 2009 WL 735140, at *3 (economies of scale allegations insufficient where plaintiff did not allege the adviser's "costs nor the number of transactions during the relevant period").  It is no surprise that the range of appropriate fees will be different for funds with different levels of operating expenses and/or different historical performance.

---

[9]    *See* D.I. 17 Ex. A at 17 (Overseas Fund compared to MSCI EAFE Index); D.I. 17 Ex. L at 36 (Mercer Fund compared to MSCI World Index).  Although Plaintiffs claim that any argument regarding performance benchmark indices is "outside the pleadings" (D.I. 21 at 20), the benchmarks referenced here are included in the prospectuses for the Overseas Fund and the Mercer Fund (D.I. 17 Ex. A at 17 & Ex. L at 36), and thus can be considered by the Court on a motion to dismiss.

### III.  PLAINTIFFS' ECONOMIES OF SCALE ALLEGATIONS ARE TOO CONCLUSORY TO STATE A CLAIM.

In its opening brief, Defendant established that allegations that a defendant "must have" realized economies of scale because fund assets increased over time, and that a defendant "must have" failed to share those putative economies, are insufficient to survive dismissal.  (D.I. 16 at 15-18.)  Numerous cases have rejected complaints that "d[id] not explain how, but merely presume[d] that, economies of scale were achieved," *In re Scudder Mutual Funds Fee Litig.*, No. 04 Civ 1921, 2007 WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007), holding that "non-Fund-specific, economic analysis regarding theoretical economies of scale" is not sufficient to survive a motion to dismiss, *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 528 F. Supp. 2d 332, 339 (S.D.N.Y. 2007), *aff'd in part, vacated in part sub nom.*, *R.W. Grand Lodge of F. & A.M. of Penn. v. Salomon Bros. All Cap Value Fund*, 425 F. App'x 25 (2d Cir. 2011).  The courts have further held that a complaint must be dismissed where the plaintiff "neglect[s] to specify how any purported economies of scale were not passed on to the investors.  Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors."  *In re Scudder*, 2007 WL 2325862, at *16.

Plaintiffs suggest that the insufficiency of allegations regarding economies of scale do not warrant dismissal at the pleading stage.  (*See* D.I. 21 at 27.)  In fact, the case law is to the contrary.  *In re Scudder*, 2007 WL 2325862, at *16 (dismissing § 36(b) claim based, in part, on insufficient economies of scale allegations); *In re Salomon Smith Barney*, 528 F. Supp. 2d at 339

(same); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 539-40 (S.D.N.Y. 2008) (same); *Mintz*, 2009

WL 735140, at *3 (same).[10]

Plaintiffs assert that their allegations regarding economies of scale "are of the same

nature and specificity" that two courts found sufficient.  (D.I. 21 at 25-26.)  This is incorrect.  In

*Kasilag v. Hartford Investment Financial Services, LLC*, the plaintiffs not only explained in

detail why the fee schedule and breakpoints at issue did not sufficiently pass on economies of

scale, they also "bolster[ed] th[at] allegation with specific facts pertaining to the individual

funds."  No. 11-1083, 2012 WL 6568409, at *6 (D.N.J. Dec. 17, 2012).  The plaintiffs in *Kasilag*

detailed the fee schedules and breakpoints negotiated by the adviser-defendant with its sub-

advisers that were allegedly more advantageous.  Further, the totality of the allegations with

respect to the challenged fees in *Kasilag* far exceeds Plaintiffs' allegations here – for example,

the plaintiff in *Kasilag* made allegations with respect to five of the six *Gartenberg* factors.  As

for the decision in *In re Federated*, it is inapposite.  Contrary to Plaintiffs' assertion, the court

there did not make a finding with respect to whether the complaint had adequately pled a failure

---

[10]      Plaintiffs also suggest that their lack of allegations regarding Defendant's costs can be
remedied through discovery.  (D.I. 21 at 28.)  The courts, however, have required that allegations
that economies of scale were not passed on to investors include allegations regarding a fund's
costs.  *See In re Salomon Smith Barney*, 528 F. Supp. 2d at 339  ("Plaintiffs cannot meet their
burden simply by pointing to the size of the funds and their rates of growth.  There must be
allegations regarding the costs of performing fund transactions or the relationship between such
costs and the number of transactions performed."); *Hoffman*, 591 F. Supp. 2d at 540 ("In order to
meet their burden [with respect to economies of scale], Plaintiffs must make a substantive
allegation regarding the actual transaction costs at issue and whether the costs per investor
increased or decreased as the assets under management grew."); *Mintz*, 2009 WL 735140, at *3
(economies of scale allegations insufficient where plaintiff did not allege the adviser's "costs nor
the number of transactions during the relevant period").

Plaintiffs cite *American Chemicals* as supplemental authority (D.I. 22), but the court
there likewise cautioned that economies of scale allegations cannot be based upon generalities
alone.  *See American Chemicals*, No. 4:14-cv-00044-JAJ, at 8 ("Because allegations based on
economies of scale depend in part on the status of the market as a whole, Plaintiff's inclusion of
general information regarding the market is not irrelevant on this point, despite the fact that *such
generalities alone would be insufficient to state a claim*.") (emphasis added).

to pass on economies of scale.  Rather, the court discussed economies of scale as part of its consideration of the totality of the allegations pled, which were far more detailed and specific than the allegations in this Complaint.  2009 WL 5821045, at *6-7; *see supra* at 8.

Finally, because Plaintiffs have not adequately alleged the existence of economies of scale, their focus on the absence of breakpoints in First Eagle's fee agreement with the Funds is irrelevant.  *See In re Am. Mutual Funds Fee Litig.*, No. CV 04-5593, 2009 WL 5215755, at *51 (C.D. Cal. Dec. 28, 2009) (Plaintiffs have the burden of "establish[ing] that economies of scale were realized in the first place, separate and apart from their burden of proving that any scale economies were not adequately shared with investors.").  Plaintiffs seek to shift the pleading burden to Defendant and argue that Defendant "does not claim" it shared economies of scale with investors.  (D.I. 21 at 29.)  Though not obliged to prove that Plaintiffs' generic allegations are false, First Eagle's Statement of Additional Information for 2004 in fact does just that, detailing how First Eagle reduced its fees to share economies of scale with investors.[11]  Prior to March 1, 2004, the Global Fund had an advisory fee of 1% on the first $25 million and 0.75% on all other assets.  First Eagle subsequently reduced the fee to charge 0.75% on all assets.  *See* First Eagle Funds Statement of Additional Information, dated February 27, 2004 (listing the adviser fee for the Global Fund at 0.75% and noting that "prior to March 1, 2004 the Global Fund paid ASB Advisers a 1.00% fee on the first $25 million of average daily net assets and 0.75% on the balance") (attached as Exhibit P to the Declaration of Matthew J. Thome, dated October 9, 2014).

---

[11]     The Court may take judicial notice of First Eagle's Statement of Additional Information. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 n.3 (3d Cir. 2014) (court may take judicial notice of SEC filings).

## IV.    PLAINTIFFS FAIL TO ALLEGE DEFICIENCIES IN THE BOARD'S FEE APPROVAL PROCESS.

In a last-ditch effort to save their Complaint, Plaintiffs contend that the fees First Eagle receives from the Funds "should be subject to 'greater scrutiny'" because, they argue, the Board of Trustees' approval process for the fees was "deficient." (D.I. 21 at 30.)  Plaintiffs' attack on the board approval process is without basis, and instead relies on conclusory allegations insufficient to call the approval process into question.  The Court "should afford commensurate deference to the outcome" of that process.  *Jones*, 559 U.S. at 351.[12]

*First*, Plaintiffs argue that the fee approval process was deficient because the Board did not solicit proposals from multiple investment advisers.  (D.I. 21 at 30.)  Plaintiffs cite no authority for this proposition, and with good reason.  When an *investment adviser* like Mercer looks to obtain *sub-advisory* services, it has the practical ability to pick and choose between different potential sub-advisers.  But this process does not provide a good point of comparison for a *mutual fund's* fee approval process because a mutual fund "often cannot, as a practical matter sever its relationship with the adviser."  *Jones*, 559 U.S. at 338 (internal quotation marks and citations omitted); *see also Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982) ("A fund cannot move easily from one adviser-manager to another.").  For this reason, "investment advisers seldom, if ever, compete with each other for advisory contracts with mutual funds."  *Gartenberg*, 694 F.2d at 929.  Plaintiffs' theory – which faults mutual funds for not soliciting services in a market that does not exist – imposes a duty on mutual funds that

---

[12]    Although Plaintiffs rely on the legislative history behind § 36(b) to argue that their claims "must be assessed with an eye towards shareholder protection," (D.I. 21 at 11), Congress also intended the board scrutiny of adviser compensation by disinterested directors to be an independent check on adviser compensation.  *Jones*, 559 U.S. at 348.  When, as here, there are no substantive allegations to call the Board's approval process into question, "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions."  *Id.* at 352.

cannot be met as a practical matter.  Thus, the fact that the Board here did not solicit proposals

from other investment advisers does not call into question the Board's fee approval process.  *Cf.*

*Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002) ("[I]t has long been

established that there is no requirement [under § 36(b)] to actually negotiate fees at arm's

length.").

  *Second*, Plaintiffs' attempt to find fault in the absence of a "most favored nation"

provision in the fee arrangement also reflects a misconception of the Board's duties.  There is no

duty to include such a provision in a fee agreement between a mutual fund and an investment

adviser.  *Cf. Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989) (rejecting the

argument that trustees "had a duty to negotiate for the Fund the 'best deal' possible").

  *Third*, Plaintiffs contend that the Board did not devote adequate time to their

consideration of the Funds' advisory contracts because service on the Board is a part-time job for

the Trustees who also serve on the boards of other mutual funds.  (D.I. 21 at 31 citing Compl.

¶¶ 93-95).  Such facts do not call into question the independence or conscientiousness of the

Board.  *See, e.g.*, *Amron*, 464 F.3d at 345 (holding that allegation regarding service on multiple

boards is "insufficient as a matter of law"); *Migdal v. Rowe-Price-Fleming Int'l*, 248 F.3d 321,

330-31 (4th Cir. 2001).

  *Fourth*, Plaintiffs assert that the Board "relied on information and analyses that FEIM

prepared or were designed to support FEIM's rationalization for the fees charged to the Funds."

(D.I. 21 at 31; Compl. ¶ 96.)  But as the Fourth Circuit explained, this argument "sheds no light

on the question" at hand, as "[o]ne would expect any conscientious director to request

information from management and staff on the day-to-day operations from which they are

responsible."  *See Migdal*, 248 F.3d at 331.  To the extent Plaintiffs argue that the Board "did not

consider information or analyses reflecting the interests of the Funds," (D.I. 21 at 31; Compl. ¶ 97), they fail to identify with any specificity the information that was supposedly not considered by the Board.

*Fifth*, Plaintiffs' claim that the Board's process was deficient because it approved fees higher than the sub-advisory fees allegedly charged by First Eagle to Mercer and which allowed First Eagle to retain the benefits of economies of scale is completely circular, in that it assumes its own speculative premise. (D.I. 21 at 31.)

Plaintiffs contend that similar conclusory allegations were found sufficient to withstand motions to dismiss in *Reso* and *Hunt*. (D.I. 21 at 31-32). Plaintiffs misread those decisions. In *Reso*, the court described the plaintiffs' complaint as "threadbare and not well-researched." 2011 WL 5826034, at *6. Nonetheless, the court concluded that the complaint "slips in by the skin of its teeth." *Id.* In that case, however, the plaintiffs had at least alleged, as evidence of a lack of board conscientiousness, the fact that the fee rates charged the funds had remained the same since the inception of the funds notwithstanding dramatic growth in fund assets. Complaint at ¶ 48, *Reso v. Artisan Partners Ltd. P'ship*, No. 11-CV-873 (E.D. Wis. June 24, 2011) (D.I. 1). Here, by contrast, the board reduced the relevant fee rate for the Global Fund in 2004. *See* Thome Decl., Ex. P. In *Hunt*, the plaintiffs' complaint recited a Morningstar Inc. report concluding that the fund family at issue in that case was "troubled, beset by high fees, lackluster 'board quality,' and a distressed 'corporate culture.'" Second Amended Consolidated Complaint at ¶ 117, *Hunt v. Invesco Funds Group, Inc.*, No. 04-CV-2555 (S.D. Tex. August 30, 2005) (D.I. 104-1), 2005 WL 4684986. Plaintiffs' Complaint contains no such allegations; indeed, Plaintiffs have objected to any reference to Morningstar reports in evaluating their claims. (*See* D.I. 21 at

13-15.)  Thus, Plaintiffs' allegations here fall below the threadbare and poorly researched

allegations that barely survived motions to dismiss in the cases on which they rely.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should grant Defendant's motion to dismiss the

Complaint for failure to state a claim upon which relief can be granted.

|  |  |
|---|---|
| Of Counsel: | */s/ Jason J. Rawnsley* _____ |
|  | Frederick L. Cottrell, III (#2555) |
| Lori A. Martin | Jason J. Rawnsley (#5379) |
| Brad E. Konstandt | Richards, Layton & Finger, P.A. |
| Wilmer Cutler Pickering Hale and Dorr LLP | One Rodney Square |
| 7 World Trade Center | 920 N. King Street |
| 250 Greenwich Street | Wilmington, DE  19801 |
| New York, NY 10007 | (302) 651-7700 |
| (212) 230-8800 | cottrell@rlf.com |
| Lori.Martin@wilmerhale.com | rawnsley@rlf.com |
| Brad.Konstandt@wilmerhale.com |  |
|  | *Attorneys for Defendant* |
| Matthew T. Martens | *First Eagle Investment Management, LLC* |
| Matthew J. Thome |  |
| Wilmer Cutler Pickering Hale and Dorr LLP |  |
| 1875 Pennsylvania Avenue NW |  |
| Washington, DC 20006 |  |
| (202) 663-6000 |  |
| Matthew.Martens@wilmerhale.com |  |
| Matthew.Thome@wilmerhale.com |  |

Dated:  October 9, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to registered participants, and further certify that I caused copies of the foregoing document to be served upon the following via electronic mail:

Richard A. Barkasy
SCHNADER HARRISON SEGAL & LEWIS LLP
824 N. Market Street, Suite 800
Wilmington, DE 19801
(302) 888-4554
rbarkasy@schnader.com

Robin F. Zwerling
Jeffrey C. Zwerling
Susan Salvetti
Andrew W. Robertson
ZWERLING, SCHACHTER & ZWERLING, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900
rzwerling@zsz.com
jzwerling@zsz.com
ssalvetti@zsz.com
arobertson@zsz.com

Ira N. Richards
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000
irichards@schnader.com

*/s/ Jason J. Rawnsley*
Jason J. Rawnsley (#5379)
rawnsley@rlf.com